**Dr. L. Andrew POTEMRA, Plaintiff,**

v.

**Dr. Charles J. PING et al., Defendants.**

**No. C–2–78–644.**

United States District Court,
S. D. Ohio, E. D.

Dec. 19, 1978.

---

**9.** See 536 F.2d at 575 and 579 F.2d at 762. This would cover 1971.

Jerry Weiner, Weiner & Lippe Co., L.P.A., Columbus, Ohio, for plaintiff.

Gerald A. Mollica, Walker, Mollica & Gall Co., L.P.A., Athens, Ohio, for defendants.

KINNEARY, District Judge.

## OPINION AND ORDER

This action was instituted under the Civil Rights Act of 1871, 42 U.S.C. §§ 1983 and 1985. The plaintiff, Dr. L. Andrew Potemra, was discharged from his position as a tenured instructor in the Department of Economics at Ohio University in Athens, Ohio. The plaintiff alleges that he was deprived of rights secured by the Constitution of the United States as a proximate result of the actions of the defendants and the Board of Trustees of Ohio University. A trial to the Court was held on November 16, 1978. Based upon the evidence adduced at trial, the post-trial memoranda of the parties, the pleadings and the other materials presently before it, the Court makes the following findings of fact and conclusions of law.

## Findings of Fact

The plaintiff joined the Department of Economics at Ohio University in 1966. He was granted tenure in 1970. Beginning sometime in 1976 the plaintiff ceased virtually all attendance at meetings and other official functions of the Department of Economics as a protest for his not being promoted to full Professor.

In the following year, a number of incidents with regard to his classes in the winter and spring quarters of 1977 caused student complaints about the plaintiff which led to an investigation of his performance in the classroom and his ability to relate to students.

On May 6, 1977, at the request of the Department of Economics, the plaintiff received a letter from the defendant Dean Gerald Silver informing him that he was being suspended from his teaching and classroom responsibilities for a period of two weeks (joint exhibit III, item 6).

Investigation of the plaintiff's performance was then begun by the legal counsel for the University, defendant John F. Burns, who appeared in the classes of the plaintiff and requested that students submit letters setting out their views concerning the plaintiff.

For reasons which are disputed, no meetings took place between the plaintiff and Dean Silver or defendant Dr. Ismail Ghazalah, the Chairman of the Economics Department. On May 20, 1977, another letter was received informing the plaintiff that his suspension would continue indefinitely (joint exhibit III, item 8).

A conference with the Provost, defendant Neil S. Bucklew, took place on June 6, 1977 for the purpose of seeking a settlement in accordance with the procedures outlined in the Ohio University Faculty Handbook, Section II(D)(5)(a). No settlement was reached. The plaintiff was, however, represented by legal counsel at that meeting.

On July 28, 1977, defendant Charles J. Ping, the President of the University, notified the plaintiff that formal dismissal proceedings were being undertaken upon the grounds of willful neglect of departmental responsibilities, and inability properly to carry out teaching responsibilities with regard to effective communication with students and behavior in the classroom. President Ping's letter further detailed the charges as follows:

Specifically, with respect to your willful neglect of your departmental responsibilities, you have:

(1) refused to attend departmental meetings, participate in departmental activities, and serve on departmental committees during this past academic year;

(2) you have consistently refused to meet with your department chairman or any of your departmental colleagues to discuss your refusal to participate in departmental activities:

(3) you have refused to meet with the Dean of your College to discuss this matter; and

(4) you have failed to respond to departmental memoranda requesting information and materials and failed to comply with personal requests of departmental staff for such information.

With respect to your inability to carry out properly your teaching responsibilities and your behavior in the classroom, you have:

(1) On numerous occasions during your Econ. 101 class, Spring Quarter, 1977, refused to communicate with your students by not responding to questions. Beyond unresponsiveness you have acted in an unprofessional manner in criticizing students' inquiries.

(2) You have on a number of occasions acted in a belligerent and abusive manner towards students. This conduct has exceeded the bounds of professional behavior and personal courtesy in a classroom.

(3) On at least one occasion your actions in refusing to allow a student to leave the classroom to go to the restroom during an examination on the rationale he would cheat seems un-

reasonable. This led to personal embarrassment for the student.

(4) Your decision to give a substantial number of the Econ. 101 students F's on their first examination and almost all F's on the second examination this past quarter, and your explanation that the class had conspired to flunk the course to harass you is indicative of your failure to communicate effectively with your students and properly carry out your teaching assignments.

In accordance with the Faculty Handbook, Section II(D)(5)(b), the plaintiff requested a hearing. The hearing began on October 7, 8, and 9 and, after an adjournment to provide an opportunity for settlement with the Department of Economics, the hearing was concluded on November 21 and 22, 1977.

The hearing was before a committee of the Faculty Senate. Mr. Burns was the chief representative of the President at the hearing. The plaintiff was informed of his right to legal counsel, but instead brought a fellow Economics professor, Dr. Deuster, to advise him. During the course of the hearing, both the plaintiff and Dr. Deuster questioned witnesses.

Prior to the hearing, the plaintiff had refused to attend two meetings for the purpose of establishing the procedures to be used at the hearing. The plaintiff testified that he "understood the rules" and felt the meetings were unnecessary. As a result he was given a copy of the hearing procedures upon his arrival at the hearing (joint exhibit IV, appendix B).

Although not expressly objecting, the plaintiff did inquire why the witnesses would not be testifying under oath. The Chairman of the Faculty Senate Committee determined that an oath was not necessary "because this is a committee of peers, it is not a court of law" (joint exhibit II, tr. 7).

The hearing was conducted informally; though witnesses were called, questions and even arguments were freely made by all of the major parties at virtually any time. The plaintiff responded to the committee's questions, and fully discussed all of the charges outlined in the letter of July 28 from President Ping.

The plaintiff did not call any witnesses in his behalf (joint exhibit II, tr. 362). His statement at trial that he did not call witnesses because he was prohibited from contacting students by the letter of suspension from Dean Silver on May 6, 1977 is simply not credible. The Court finds that the actual reason for the plaintiff's failure to contact witnesses prior to the hearing was as he stated at the hearing:

I'll tell you why. Because then I'm going to, you see, I have done nothing for my defense so far . . . because I didn't think this was serious, for a very long time I thought it was a dirty joke; a joke, but a bad joke, now I am serious . . . .

(Joint exhibit II, tr. 1–2.) In any event, the plaintiff himself admitted that the Committee had offered to help him call witnesses at the time of the hearing.

In a written opinion dated January 10, 1978, the faculty committee upheld the plaintiff's loss of tenure and removal from the Ohio University faculty. The report and decision of the committee was sustained by the Board of Trustees of the University on April 15, 1978.

The plaintiff filed this complaint on July 12, 1978. After the defendants filed a motion to dismiss, the parties agreed to a disposition of the motion which concluded as follows:

4. The Court will hear the Complaint on the issue of whether or not Plaintiff was afforded due process prior to being detenured and, if he did not receive due process, the Court will provide relief consistent with its findings as it may deem appropriate.

### Discussion

As agreed by the parties, the only issue before the Court is whether the plaintiff received the process which was due him under the fourteenth amendment before losing his tenured position at a state univer-

sity. There is no question that the plaintiff had a valuable property right and an expectancy of continued employment which was deprived by government action. *See Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Orr v. Trinter,* 444 F.2d 128 (CA6, 1971), *cert. denied,* 408 U.S. 943, 92 S.Ct. 2847, 33 L.Ed.2d 767, *rehearing denied,* 409 U.S. 898, 93 S.Ct. 95, 34 L.Ed.2d 157 (1972). Nor does plaintiff claim that he was discharged for the exercise of any right guaranteed by the Constitution of the United States. *E. g., Hetrick v. Martin,* 480 F.2d 705 (CA6, 1973).

In an effort to maintain what is perceived as the historical flexibility of the concept of "due process of law"[1] the Supreme Court has made it clear that the precise contours of due process will vary from case to case. *Ingraham v. Wright,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) (due process does not require notice or hearing of any kind prior to paddling of school children by school authorities); *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (high school students must be given at least oral notice and informal opportunity to be heard prior to temporary suspension). While it is usually agreed that state deprivations of protected rights require notice and an opportunity to be heard, the myriad questions concerning what kind of notice and what kind of hearing have led the Supreme Court to adopt a three-factor analysis to determine the sufficiency of government process in a particular case. In *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the Court stated that

> [O]ur prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the

probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that additional or substitute procedural requirement would entail.

424 U.S. at 334–35, 96 S.Ct. at 903.

█ While these factors are helpful in focusing the Court's inquiry, this analysis provides no guidance as to how the ultimate balance should be struck. Some courts, however, have isolated the context of teacher dismissals from state schools and have attempted to be more specific in describing the requirements of due process. *See Stewart v. Bailey,* 556 F.2d 281, 285 (CA5, 1977) (citing *Ferguson v. Thomas,* 430 F.2d 852–56 (CA5, 1970)). This Court has previously held that a teacher's minimum due process guarantee includes:

1. A written statement of the reasons for the proposed [dismissal] . . . prior to the time any final action is taken.

2. Adequate notice of a hearing at which the teacher may respond to the stated reasons for the proposed . . . [action].

3. A hearing at which the teacher must be afforded an opportunity to submit relevant evidence controverting the stated reasons.

4. If the board of education finds [against the teacher] . . ., it must state the reason or reasons supporting the decision.[2]

*Orr v. Trinter,* 318 F.Supp. 1041, 1046 (S.D. Ohio, 1970), *reversed on other grounds,* 444 F.2d 128 (CA6, 1971), *cert. denied,* 408 U.S. 943, 92 S.Ct. 2847, 33 L.Ed.2d 767, *rehearing denied,* 409 U.S. 898, 93 S.Ct. 95, 34 L.Ed.2d 157 (1972).

The above listed findings of fact indicate that the defendants have ostensibly provid-

---

**1.** "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972).

**2.** This requirement presumes that the fact finding board or tribunal will be impartial. *Cf. Brouillette v. Board of Directors,* 519 F.2d 126, 128 (CA8, 1975).

ed the minimum process mandated in *Orr.* The President's letter of July 28, 1977 specifically stated the reasons for the loss of tenure proceedings. It also gave adequate advance notice of the October hearing. The hearing provided ample opportunity for the plaintiff to present relevant evidence in his behalf, and the decision of the Faculty Senate Committee adverse to the plaintiff was delivered in a thorough written opinion which dealt strictly with the charges alleged in the July 28 letter. The plaintiff, however, alleges that certain errors committed before and during the hearing so infected the proceedings as to deny due process to the plaintiff. The Court will therefore consider the specific objections of the plaintiff.

■ The plaintiff objects to the participation in the hearing of the defendant John F. Burns, the legal counsel for Ohio University. As a part of the President's case against the plaintiff, Mr. Burns submitted a memo he prepared in evaluating the President's case for the dismissal of the plaintiff. The memo described the plaintiff as "delusional and paranoid." Reference to these terms was also made in Mr. Burns' opening statements at the hearing. The plaintiff claims that Mr. Burns, who never was a witness, was not subject to cross-examination. The Court disagrees. The hearing transcript makes clear that the plaintiff had and availed himself of the opportunity to question anyone at any time during the hearing. Questions were freely asked of Mr. Burns by both the plaintiff and the committee members. The plaintiff also claims that Mr. Burns' description of the plaintiff was "so inflammable [sic] and prejudicial that the triers of the facts could not be fair and impartial." It was clear from the outset of the hearing that Mr. Burns represented the President, who had already determined that the plaintiff should be dismissed (joint exhibit III, tr. 8–9). The committee was aware that the plaintiff and Mr. Burns were adversaries. There is nothing in the record which indicates that the committee was misled on this point, and the committee report demonstrates that the committee relied only upon the plaintiff's actual behavior and not upon Mr. Burns' amateur medical description of that behavior. Since the plaintiff offered no evidence to show actual impartiality on the part of the committee, the Court is of the opinion that no violation of due process and, indeed, no harm to the plaintiff was caused by Mr. Burns' participation in the hearing. *Shaw v. Board of Trustees,* 396 F.Supp. 872 (D.Md., 1975); *see generally Simard v. Board of Education,* 473 F.2d 988 (CA2, 1973).

■ The plaintiff also objects to the suspension letters from Dean Silver on two grounds. The first, is that the letter of May 6, 1977 prevented the plaintiff from seeking student testimony in his favor.[3] The Court has previously found that this letter was not the cause of the plaintiff's failure to contact students prior to the hearing. In any event, the plaintiff could still have sought witnesses at the time of the hearing. *See, Simard v. Board of Education, supra* at 994. The committee showed great flexibility throughout, and showed its willingness even to recess for the plaintiff's convenience. No effort was made to hamper in any way the plaintiff's ability to present relevant evidence. The plaintiff also demonstrated his knowledge that he did have legal and procedural rights as early as June 6, 1977, when he met with the Provost accompanied by an attorney. The Court is therefore of the opinion that the decision not to call witnesses was consciously made, and that no harm was caused by the ambiguity of the May 6, 1977 letter.

■ The second ground for attacking Dean Silver's suspension letters is that the very fact of suspension so prejudiced the plaintiff at the loss of tenure hearing that the Faculty Senate Committee could not be impartial. This is because the Faculty Handbook provides for suspension during

---

**3.** The letter stated in part: "You are not to attend your classes for the period stated or initiate any contact with the students regis- tered in these classes;" joint exhibit III, item 6, at 2.

loss of tenure proceedings "only if immediate harm to himself and others is threatened by his continuance," (joint exhibit I, section II(D)(5)(e)). Plaintiff has offered no evidence to indicate that the committee gave any weight to the fact that the plaintiff had been suspended during the proceedings. The decision to suspend a faculty member in such circumstances must necessarily be made by the Dean as a representative of the President. The transcript of the hearing and the opinion of the committee demonstrate that the Faculty Senate Committee, composed as it was of faculty members in a similar position to that of the plaintiff, fully appreciated the adverse positions of the plaintiff and the Dean and the President. The Court is unable to discern any lack of procedural fairness in the mere fact of the plaintiff's suspension.

█ The plaintiff objects to a letter addressed to the Chairman of the Faculty Senate Committee which described the meetings conducted by the Department of Economics and the plaintiff during the October 9 to November 21 recess of the hearing. The recess and meetings were a result of the plaintiff's suggestion that the matter might be settled by an agreement between the plaintiff and the Department of Economics. The plaintiff objects again on two grounds. He asserts that the committee was not impartial because the letter branded the plaintiff as a "nut." This contention is nearly frivolous, because the letter merely mentions, almost in passing, that one professor suggested a medical opinion, and that suggestion was rejected by the plaintiff. The letter was otherwise simply informing the committee that no settlement had been reached. The committee was well aware that the Economics Department was in favor of the plaintiff's loss of tenure; plaintiff has not offered any evidence to show that the committee ever lost sight of that fact. In addition, the opinion of the committee shows that its decision was based solely on the evidence offered at the hearing. The committee did not even consider the letter from the Economics Department in making its decision. Plaintiff has offered no evidence to the contrary. Thus,

the other objection to this letter, that the plaintiff had no opportunity to respond to it, must also fail. Since the letter was not evidence considered by the committee, no harm to the plaintiff was caused.

Finally, the plaintiff objects to the failure to place witnesses under oath. While there are clear examples of cases in which oaths were not administered at due process hearings, research has not disclosed any case which expressly considers the need for an oath in this context. In this case, there were disputed issues of fact which made the use of oral testimony and cross-examination indispensable. See *Goldberg v. Kelly,* 397 U.S. 254, 267–69, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). At the plaintiff's hearing, the calling and examination of witnesses was conducted very much as in a judicial trial. The only difference was the lack of an oath.

This final objection asserts that due process was denied in this case because a further procedural protection was not employed. A claim for additional procedures, such as an oath, presents the precise issue for which the three-pronged analysis of *Mathews v. Eldridge, supra,* was devised. The Court will therefore use that analysis and a comparison with the Supreme Court's resolution of the process required in *Goldberg v. Kelly, supra,* a case upon which the plaintiff heavily relies. The use of the *Mathews* analysis is to focus attention upon the proper factors. The comparison with *Goldberg* is to indicate how the final balance may be struck.

The private interest involved here, the retention of a tenured teaching position, is very important. See joint exhibit IV, pp. 2–4. The private interest in *Goldberg,* the retention of welfare payments which were the very means of life, was even more important, see 397 U.S. at 264, 90 S.Ct. 1011. The administrative burden upon the State of Ohio here is not significant. Given that a hearing is required as a due process minimum, the additional step of swearing witnesses should not be a practical burden. In *Goldberg,* the same was true. The huge burden the State of New York sought to

avoid was the requirement of a prior evidentiary hearing. Once the hearing was required, the administration of an oath to witnesses would not be a significant additional burden. The state's interest, then, in avoiding the use of an oath in this case is the desire to prevent the hearing from becoming too formal and to retain the "peer group" ambience.

█ The remaining factor to be considered in the *Mathews* analysis is the effectiveness of the additional procedure in reducing the risk of an erroneous deprivation of a protected liberty or property interest. An oath certainly has some usefulness in this regard, or its use in all courts of law would be puzzling. The oath would appear to be especially useful as a vehicle for ascertaining the truth where issues of fact are fully and hotly contested. The trier of fact, in accepting one version of the facts, is virtually determining that the other side has not been truthful. Where witnesses are self-interested and the incentive to evade or shade the truth is high, the opposite incentive created by an oath may provide an appreciable safeguard for someone about to be deprived of a liberty or property interest. Especially where other procedural protections are lacking, the use of an oath could be important to the ultimate determination that minimal due process was afforded. It is instructive to note, therefore, that in *Goldberg,* a case in which the private interest at stake was greater than that in the case at bar, the Supreme Court determined that "[i]nformal procedures will suffice; in this context due process does not require a particular order of proof or mode of offering evidence." 397 U.S. at 269, 90 S.Ct. at 1021.

█ In the instant case, very few of the facts were wholly contested by the plaintiff. *See* joint exhibit IV. The committee's central concern was with the plaintiff's justification for his actions, and, accordingly, whether that conduct was professionally acceptable. Few of the witnesses can even arguably be described as self-interested in the manner of a party witness in a civil trial, or a witness at an agency hearing who either seeks or is subject to that agency's regulation. The plaintiff has offered no evidence or argument besides pointing to the lack of an oath to persuade this Court that an oath was necessary in this case. In sum, the Court is not convinced that the witnesses at this hearing were substantially more likely to testify untruthfully because no oath was administered. The lack of an oath in this case did not make this otherwise extensive evidentiary hearing fundamentally unfair or Constitutionally infirm.[4]

### Conclusions of Law

The Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1343.

The proceedings undertaken by the Ohio University in the removal of the plaintiff from his position as a tenured faculty member did not deprive the plaintiff of due process of law under the Fourteenth Amendment to the Constitution of the United States.

WHEREUPON, IT IS HEREBY ORDERED THAT the Clerk shall enter final judgment in favor of the defendant.

---

4. Although the Court has engaged in a very particularized analysis of the facts of this case in determining the need for sworn testimony, the Court is of the opinion that the four due process minima set out above which were originally described in *Orr v. Trinter, supra,* are so fundamental as to be required under the *Mathews* analysis in every case involving the dismissal of a teacher with a state-created expectancy of continued employment.