Cheryl A. BLEICKER, Plaintiff,

v.

The BOARD OF TRUSTEES OF The OHIO STATE UNIVERSITY, COLLEGE OF VETERINARY MEDICINE, and C. Roger Smith, D.V.M., its Dean, jointly and severally, Defendants.

No. C-2-80-187.

United States District Court,
S. D. Ohio, E. D.

March 26, 1980.

Richard C. Graham, Trial Atty., Isaac, Graham & Nester, Columbus, Ohio, Elliott R. Perlman, Perlman, Garber & Holtz, P. C., Southfield, Mich., for plaintiff.

Thomas W. Hill, Emens, Hurd, Kegler & Ritter, Trial Atty., John C. McDonald, Emens, Hurd, Kegler & Ritter, Columbus, Ohio, for The Ohio State University; Robert L. Holder, Asst. Atty. Gen., Columbus, Ohio, of counsel.

## OPINION AND ORDER

KINNEARY, District Judge.

This matter is before the Court upon plaintiff's motion for a preliminary injunction. Plaintiff alleges that her dismissal from the College of Veterinary Medicine of The Ohio State University for professional misconduct and academic insufficiency constituted a denial of due process and equal protection and a violation of 20 U.S.C. Section 1681(a). Accordingly, plaintiff seeks a mandatory preliminary injunction requiring defendants to readmit her for the spring quarter of 1980.

The Court held an evidentiary hearing on the motion on March 17, 1980. Based upon

the evidence adduced at that hearing, the pleadings, the memoranda of the parties, and other materials before it, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52, Federal Rules of Civil Procedure.

## Findings of Fact

Plaintiff entered the College of Veterinary Medicine at The Ohio State University [Veterinary College] as a freshman in 1976. In February, 1977 she received a warning from the Student Council of possible violation of the student Honor Code provision that prohibits giving or taking aid during examinations (defendants' exhibit A). In May, 1979 she was found by the Student Council to have engaged in unethical conduct—but not cheating—by virtue of her unauthorized perusal of examination materials in the office of Professor Dennis Chew. The matter was forwarded to the College Executive Committee, with the recommendation that no disciplinary action be taken against plaintiff. The Executive Committee, which represents the faculty and administration of the College, accepted the recommendation (defendants' exhibit B).

On December 10, 1979 plaintiff was notified of her disciplinary dismissal for two quarters after she was found by both the Student Council and the Executive Committee to have violated the Honor Code prohibition against misrepresenting one's work or fraudulently or unfairly advancing one's academic status. Specifically, on November 9, 1979 she sat for a latent image examination [1] administered by Professors Chew and Sherding as part of the requirements for Veterinary Clinical Sciences 721, Advanced Canine and Feline Medicine II. These faculty members subsequently notified the president of the senior class at the Veterinary College that they suspected plaintiff of violating the Honor Code:

A clear and deliberate attempt to deceive the instructor's grading of the examination was discovered. Partial development of the latent image responses were subsequently and carefully covered up by pen-written notes such that the wrongly-selected latent image responses were difficult and near impossible to detect by the person grading the examination. This was clearly not an accidental occurrence, but rather was intentional, inasmuch as this type of coverup occurred at numerous places throughout the examination paper. The examination has been impounded and is presently being kept under lock and key.

(Defendants' exhibit I.)

On November 13 Student Council President Anne Phlipot telephoned plaintiff to inform her that she had been accused of violating the Honor Code and would be given a hearing before the Student Council on November 16. Plaintiff inquired about the nature of the violation and the identity of her accuser but Ms. Phlipot asserted that it was not the policy of the Student Council to reveal such information in advance. Plaintiff was not told that she could present witnesses or documentary evidence at the council hearing; she was aware of this right, however, as a result of her prior appearances before the Student Council. She was not told of the possible penalties that could be imposed if she were found culpable of the charge. The Honor Code itself—which had previously been furnished

1. The latent image examination is a nontraditional pedagogical technique used by the College to test a student's ability to solve clinical diagnostic problems. The method simulates a clinical encounter by revealing sequentially during the course of the examination whether the patient histories "taken," diagnoses "made," and clinical procedures "performed" were correctly selected and what results they would have yielded. The examination booklet lists several possible diagnoses, clinical tests, and modes of treatment; the student indicates his or her choices by applying a special yellow marking device to a numbered column on the test booklet. As the marker is applied, the previously blank paper is "developed" to reveal the "latent image"—words or numbers representing either the correctness of the answer or the results of the clinical procedures chosen by the student. Points are awarded for correct choices marked by the student and deducted for incorrectly marked choices. If no yellow mark appears, points are neither added nor subtracted. Plaintiff was accused of writing with an ordinary blue ink ballpoint pen deliberately to obscure the yellow marks that had developed when she selected incorrect answers to certain questions.

to plaintiff—recites the scope of penalties for misconduct (defendants' exhibit C at 3).

The panel before which plaintiff appeared on November 16 consisted of eight students elected by their classmates at the Veterinary College to serve on the Student Council, and the faculty advisor, Dr. Wesley Anderson. Plaintiff and the two instructors, Drs. Chew and Sherding, testified at the hearing. Plaintiff and Dr. Chew gave conflicting testimony concerning whether plaintiff had called more than one of the suspiciously marked answers to Dr. Chew's attention immediately after the examination.[2] Plaintiff was allowed to inspect the examination booklet and to question Dr. Chew.

In the absence of plaintiff and the complaining faculty the Student Council reached a unanimous decision that plaintiff was guilty of the Honor Code infraction with which she had been charged. They recommended to the Executive Committee that plaintiff be suspended from the Veterinary College for at least one and possibly two quarters—during which time she should receive psychiatric counseling—and be readmitted for summer quarter 1980 in order to fulfill the requirements for graduation by June of 1981 (defendants' exhibit J). On November 21 Dr. Anderson and two members of the Student Council told plaintiff that she had been found guilty; one of the students contacted Dr. Scott Chrisman, a psychiatrist employed by the University, and drove plaintiff to his office for immediate consultation.

The Executive Committee received the Student Council findings and recommendation at a special meeting on November 26. Plaintiff was informed orally on December 3 that the Executive Committee would hold its hearing on December 5. Although she was not furnished a written statement of the charge, she was of course well aware of the allegations of Honor Code violations by this time.

Dr. Ronald A. Wright, Associate Dean of the Veterinary College and nonvoting Secretary to the Executive Committee, testified before this Court that he and Dr. Anderson met with plaintiff some time between November 21 and December 3 and advised her that she could attend the Executive Committee meeting at which her case would be discussed, could testify, could be accompanied by anyone she chose, and could seek counsel from anyone she wished. Plaintiff, however, testified before this Court that she did not recall meeting with Drs. Wright and Anderson. She denies having been told that she could seek counsel or bring anyone she chose to the hearing. On this point the Court finds the testimony of Dr. Wright more credible than the testimony of plaintiff, who was quite understandably distressed during the events in question.

Plaintiff expressly inquired whether she could bring Dr. Ernest Boone to the hearing and received permission to do so. Plaintiff did not consult with a lawyer before the Executive Committee hearing and was not represented there by legal counsel.

At the hearing before the Executive Committee on December 5 plaintiff was first allowed to state her version of the events without interruption and then questioned by members of the Committee. Dr. Boone also testified on plaintiff's behalf in plaintiff's presence. No record was made of the proceedings apart from Dr. Wright's personal summary notes. After plaintiff was asked to leave the hearing room the Committee heard testimony from plaintiff's advisor, Dr. James Burt.[3] The Committee

2. Dr. Chew testified both at the November 16 hearing, defendants' exhibit J, and before this Court that he believed plaintiff drew his attention to an answer in which the yellow mark was clearly visible despite lining out in ink in order to divert his attention from other answers in which the yellow marks were virtually obscured by words written repeatedly in blue ink. Plaintiff testified in her various hearings that she told Dr. Chew when she relinquished · her examination booklet that there were several irregular answers, but that he was inattentive.

3. A subcommittee of the Executive Committee met on November 30 with Dr. Chrisman, the psychiatrist to whom plaintiff had been referred. Plaintiff was not invited to attend that meeting, at which Dr. Chrisman expressed his opinion that plaintiff had not cheated on the

then went into closed executive session which was adjourned until December 10.

At the conclusion of its deliberations on December 10, the Executive Committee announced its decision to plaintiff in a written memorandum from Dean C. Roger Smith:

> Miss Cheryl Bleicker will be dismissed from the College of Veterinary Medicine for professional misconduct for two quarters beginning with Winter Quarter 1980. She may apply for readmission to a regular College quarter or term following the Winter and Spring Quarters 1980. Consideration for readmission will be contingent upon a certification of normal health status by The Ohio State University Health Service.

(Defendants' exhibit F.) Plaintiff was also given the grade of E in Advanced Canine and Feline medicine, without regard for her performance in that course apart from the examination that gave rise to her dismissal. Plaintiff unsuccessfully appealed the decision of the Executive Committee to the Provost of the University.

Shortly after plaintiff was subjected to the *disciplinary* dismissal just described, she received from the Veterinary College written notice of *academic* dismissal for failing Equine Medicine and Surgery, a required core course (defendants' exhibit H).[4] The letter of academic dismissal is dated December 27, 1979 and signed by Dr. W. Keith Wearly, Secretary of the College. Dr. Wearly reminded plaintiff of the rule, published in The Ohio State University Bulletin for the College of Veterinary Medicine (defendants' exhibit G at 13), that students receiving the grade of E in a core course shall be dismissed for failure to meet minimum academic standards, and students receiving an E in an elective course shall be placed on probation and required to repeat the course as soon as possible.

Plaintiff was already on academic probation for receiving an E in an elective course, Veterinary Clinical Sciences 731, Medical Diseases of the Horse, during the Spring Quarter of 1979. Thus, the punitive grade of E in the elective course that led to disciplinary dismissal caused neither plaintiff's placement on probation nor her academic dismissal.

The Court finds that the automatic academic dismissal was independent of the disciplinary dismissal. Plaintiff had completed the Equine Medicine and Surgery core course in October. Accordingly, the honor code violation in November could not have affected the personal observation by the seven members of the team of clinical instructors of plaintiff's performance in that course. Dr. Catherine Kohn, a member of the instructional team, testified that she was unaware of the professional misconduct charge pending against plaintiff when the team met to assign plaintiff's failing grade. Dr. Wright testified that the Executive Committee was not aware of plaintiff's impending academic dismissal during its disciplinary deliberations.

Plaintiff is currently enrolled in the College of Continuing Education of The Ohio State University. She is pursuing nonveterinary studies which she intends to offer as electives for credit toward her veterinary degree. The Veterinary College has not determined whether it will approve these electives. Under the terms of the disciplinary dismissal plaintiff could petition the Veterinary College to allow her to resume her veterinary studies as soon as June, 1980. The Court assumes that she could simultaneously petition the Executive Committee for reinstatement subject to the condition that she remedy her numerous academic deficiencies (defendants' exhibits G at 13, H).

Plaintiff urges that if—upon the Court's order—she were readmitted immediately and given credit for her course work in the College of Continuing Education, she would be able to complete her veterinary studies during the Spring Quarter of 1980, receive her D.V.M. degree, and sit in June, 1980 for

---

examination but had manifested a typical stress response.

4. During the Autumn Quarter of 1979 plaintiff also received the grade of Incomplete, with an alternate grade of E, in Anesthesiology, another required core course (defendants' exhibit H).

the state and national veterinary certifying examinations which are administered annually to graduates (defendants' exhibit G at 13). If she does not resume her veterinary studies now, she could not sit for the certifying examinations before June of 1981 and would thus be forced to defer for at least one year her entry into licensed professional practice.

## Discussion

The Court's determination whether to grant plaintiff preliminary injunctive relief rests upon four standards set forth by the United States Court of Appeals for the Sixth Circuit:

1) Whether the [plaintiff has] shown a strong or substantial likelihood or probability of success on the merits.

2) Whether the [plaintiff has] shown irreparable injury.

3) Whether the issuance of a preliminary injunction would cause substantial harm to others.

4) Whether the public interest would be served by issuing a preliminary injunction.

*Mason County Medical Association v. Knebel*, 563 F.2d 256, 261 (CA 6, 1977). The Court will address each requirement in turn.

## I. Probability of Success on the Merits

■ A full hearing on the merits of this action would not address whether plaintiff is culpable of the Honor Code infraction upon which her disciplinary dismissal was premised, much less whether she should have received the failing grade for which she suffered academic dismissal.

It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking in wisdom or compassion. . . . [Sec-

tion] 1983 does not extend the right to relitigate in federal court evidentiary questions arising in school disciplinary proceedings or the proper construction of school regulations.

*Wood v. Strickland*, 420 U.S. 308, 326, 95 S.Ct. 992, 1003, 43 L.Ed.2d 214 (1975). The Court may properly look to whether plaintiff has been deprived of a liberty or property interest protected by the Fourteenth Amendment arbitrarily and capriciously or in the absence of constitutionally sufficient procedures.

Plaintiff asserts that her disciplinary and academic dismissals from the Veterinary College constitute a taking of property without due process of law.[5] The Court assumes, without deciding,[6] that plaintiff—a tuition-paying student enrolled at the publicly supported Veterinary College—has a property interest in completing her professional education. *See Gaspar v. Bruton*, 513 F.2d 843, 850 (CA 10, 1975).

■ The fundamental requirements of procedural due process are "notice and an opportunity for hearing appropriate to the nature of the case." *Mullane v. Central Hanover Trust Co.*, 339 U.S. 306, 313, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950) (*quoted in Goss v. Lopez*, 419 U.S. 565, 579, 95 S.Ct. 729, 738, 42 L.Ed.2d 725 (1975)). The Supreme Court has further stated that

identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal

---

5. The complaint contains additional claims that plaintiff was denied equal protection of the laws and was subjected to discrimination based on her sex, in violation of 20 U.S.C. § 1681(a). Because no evidence concerning these allegations was presented at the hearing on March 17, 1980, the Court decides this motion exclusively upon the due process issues that were contested by the parties.

6. In *Board of Curators of University of Missouri v. Horowitz*, 435 U.S. 78, 82–84, 98 S.Ct. 948, 951–952, 55 L.Ed.2d 124 (1978) the Supreme Court declined to decide whether academic dismissal from a state-supported medical school deprived the dismissed student of "liberty" by foreclosing avenues of continued education or medically-related employment. Ms. Horowitz did not claim that she had been deprived of a "property" interest.

and administrative burdens that the additional or substitute procedural requirement[s] would entail. *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

■ This Court need not engage in analysis of the foregoing factors with respect to plaintiff's academic dismissal, for the Supreme Court itself has decreed in *Board of Curators of University of Missouri v. Horowitz*, 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978), that no hearing is required for academic dismissal of a medical student at a publicly supported university. Plaintiff has been fully informed of her academic deficiencies; institutionalized means for seeking academic reinstatement remain available to her (defendants' exhibit H). Uncontroverted evidence on the record demonstrates that she has not been denied procedural due process in the matter of her academic dismissal. With respect to substantive due process, the Court in *Horowitz* appeared to countenance lower court dicta that academic dismissals can be enjoined upon a clear showing that they are arbitrary and capricious. *Id.* at 91–92, 98 S.Ct. at 955–956. Although a full hearing on the merits might reveal otherwise, the Court fails to find in the record compiled at the preliminary injunction hearing evidence that plaintiff's academic dismissal was arbitrary or capricious and thus possibly subject to judicial review.[7]

The Supreme Court has not determined what process is due a professional student who suffers disciplinary dismissal. In *Goss v. Lopez*, 419 U.S. 565, 579, 95 S.Ct. 729, 738, 42 L.Ed.2d 725 (1975), the Court held that high school students facing suspension for up to ten days for misconduct were entitled to *"some* kind of notice and . . . *some*

kind of hearing." For such brief disciplinary suspensions due process is ordinarily satisfied by an informal meeting, minutes after the misconduct, between the disciplinarian and the student in order that the student may be told what misbehavior he is accused of and allowed to present his own version of the facts. *Id.* at 582, 95 S.Ct. at 740.

■ *Goss* spoke only to short suspensions: "Longer suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures." *Id.* at 584, 95 S.Ct. at 741. Clearly, the suspension of a student of veterinary medicine for several months, perhaps permanently, is a matter that requires "more formal procedures." The question, of course, is just how much more formality is guaranteed by the Fourteenth Amendment.

■ Plaintiff's counsel identified for this Court the procedural protections that plaintiff had not received. She was not furnished a written statement of the charge. She was not given—or told that she could request—a written record of either hearing and detailed written statements of the respective findings. She was not told that she could have legal counsel at the Executive Committee hearing. She was not told that she could inspect the physical evidence prior to either hearing. She did not receive written notice of the hearing dates; the oral notice was given only three and two days prior to the respective hearings. The Court looks to *Mathews v. Eldridge, supra,* for guidance in assessing the constitutional significance of these omissions.

Plaintiff's private interest in continuing her education without interruption is assumed, for the purpose of this analysis, to be an important one.[8] The fiscal and ad-

---

7. Plaintiff attempted to establish that her grade of 2.07 in Equine Medicine and Surgery was or should have been based on the same four-point scale as the non-clinical veterinary courses and therefore should have been recorded as a passing grade of C. Dr. Kohn testified that the instructional team customarily employed a five-point system for ranking and comparing student performances. Plaintiff could have no reasonable expectation that the clinical instructors would use one numerical scale rather than another for internal purposes. In any event, it

is uncontroverted that plaintiff received the lowest score in her class for her performance in this course.

8. It may be instructive to set forth the minimum due process requirements for dismissal of a tenured public school teacher. This Court has held that such a person—whose formalized expectation of continued employment constitutes a property right far greater than plaintiff's—must be given a written statement of the reasons for the proposed dismissal prior to the

ministrative burdens upon the government—the State of Ohio, here represented by the University and the Veterinary College—to provide the omitted protections would be minimal, given the relatively formal procedures already employed.

The critical inquiry, then, is to be found in the second prong of *Mathews:* the risk that the procedures used would erroneously deprive plaintiff of her interest, and the probable protective value of the additional safeguards. Defendants would be well advised to adopt the additional procedures as a matter of routine, for under certain circumstances these relatively inexpensive safeguards might contribute significantly to protecting an important private interest. The Court believes, however, that the proposed procedures would have contributed little toward reducing the risk of error in plaintiff's case.[9] The nature of the case against plaintiff required the factfinders to evaluate plaintiff's intent and Dr. Chew's belief in relation to a single piece of undisputedly authentic physical evidence—the examination booklet. Plaintiff herself has repeatedly conceded that, construed abstractly and without explanation, her examination might be interpreted as an Honor Code violation.

Plaintiff was twice allowed to confront and question her accusers, to examine the physical evidence, to relate her version of the facts fully and offer exculpatory explanation before disinterested hearing bodies. At the second hearing, before a panel with authority to accomplish her suspension, she had actual notice of the charge and had inspected the examination booklet which she herself had marked ambiguously. The findings of the Student Council are preserved in the form of written minutes (defendants' exhibit J); the findings of the Executive Committee, although not formally recorded, were essentially identical to those of the Student Council.

Plaintiff has not suggested to the Court how she could have presented her case more effectively to the hearing bodies if she had been represented by legal counsel or had been given notice of greater duration. Indeed, the Court is struck by the apparent similarity of the nonjudicial proceedings before the Student Council and the Executive Committee, on the one hand, and the development of the record in this hearing, where plaintiff was represented by very able counsel.

The Court finds, in short, that the risk of an erroneous deprivation of plaintiff's interest was acceptably minimized by the procedural protections that she was afforded in connection with her disciplinary dismissal. Plaintiff has not shown a strong or substantial likelihood that she would prevail in a full hearing on the merits of this action.

## II. Irreparable Injury

The Court believes that plaintiff has not made the required showing of irreparable injury if she is not readmitted to the Veterinary College for Spring Quarter of 1980. The record reveals that plaintiff will be allowed to petition for readmission to the Veterinary College within a few months without the intervention of this Court. The Court's immediate order is not necessary to prevent permanent exclusion of plaintiff from the veterinary profession.

Plaintiff nevertheless contends that she would be irreparably injured by a one year delay in obtaining her professional license. Even if she were readmitted immediately, however, it is far from certain that she could fully remedy her academic deficiencies in time to graduate in June and become eligible for the 1980 licensing examination. The Court further notes that if plaintiff is

taking of any final action, must have adequate notice of a hearing before an impartial factfinding board, at which hearing the teacher may respond to the stated reasons and submit relevant evidence to controvert them, and, if dismissed, must be given a statement of the reasons supporting the decision. *Potemra v. Ping,* 462 F.Supp. 328, 332 (S.D.Ohio 1978) and cases cited therein.

9. The Court permitted plaintiff to present evidence that related to her innocence of the alleged misconduct not to assess her culpability but to determine from the circumstances what procedures were required to reduce the risk of error to a constitutionally acceptable level.

required to prolong her studies she will not be foreclosed from improving her professional skills and working with patients during the prelicensure period.

### III. Substantial Harm to Others; Service of the Public Interest

The Court agrees with plaintiff that defendants would suffer no financial detriment and might even enjoy financial benefit by readmitting her as a tuition-paying student for the coming quarter. Nevertheless, defendants have a considerable interest in protecting the integrity of their published academic standards and disciplinary regulations. Intervention of the Court into the affairs of the Veterinary College would substantially weaken its legitimate authority among its own students and members of the veterinary profession generally, a result that would significantly disserve the public interest.

### Conclusions of Law

The Court has jurisdiction of this action under 28 U.S.C. Section 1343.

■ The plaintiff has failed to demonstrate a strong or substantial likelihood or probability of success on the merits of her claim that she has been denied due process of law in derogation of her rights under the Fourteenth Amendment.

The plaintiff has failed to show that she will be irreparably injured if the Court does not order her immediate reinstatement at the Veterinary College.

Granting a preliminary injunction would adversely affect defendants' ability to maintain academic and professional standards and would not serve the public interest.

WHEREUPON, the Court determines that the motion for a preliminary injunction is without merit and it is therefore DENIED.

IT IS SO ORDERED.