Scott E. EWING, Plaintiff,

v.

BOARD OF REGENTS OF the UNIVERSITY OF MICHIGAN, Defendant.

Civ. A. No. 82–60271.

United States District Court,
E.D. Michigan, S.D.

March 22, 1983.

Michael M. Conway, Mary K. Butler, Hopkins & Sutter, Chicago, Ill., Harry Schulman, Schulman & Bell Ltd., Chicago, Ill., Timothy Fryhoff, Buesser, Buesser, Snyder & Blank, Bloomfield Hills, Mich., for plaintiff.

Peter Davis, Davis & Fajen, Ann Arbor, Mich., for defendant.

## OPINION

FEIKENS, Chief Judge.

### I.

Plaintiff, Scott E. Ewing (Ewing), was admitted as a student to the Inteflex program at the University of Michigan in the fall semester 1975; his purpose—to become a medical doctor. This six (6) year program is governed by a University Policy Committee with the Literature, Science and Arts College responsible for the curriculum awarding the B.A. (B.S.) degree and the Medical School responsible for the curriculum awarding the M.D. degree (Defendant's Exhibit 1).

The program is planned to educate individuals whose academic ability, based on high school grades and test scores, is on the same level as those who qualify for admission to the Medical School. The program runs on a ten-month academic year for the first four years. The first year preceptorship is usually over by the middle of June, but in the subsequent two years, spring half-term classes meet until the end of June. The fourth year classroom courses end in early May, allowing students to prepare for Part I of the National Board of Medical Examiners (NBME) given in mid-June. A three-week basic clerkship begins in early July, after which the Inteflex student enters the Medical School's clinical phase which ends in the spring of the sixth year with the award of the M.D. degree (Defendant's Exhibit 1, page 4).

In this case, Ewing seeks an order compelling the defendants to permit him to retake Part I of the NBME. He does so because after he failed that examination, he was dismissed from the Inteflex program.

### A.

In the fall of 1975, when Ewing enrolled in the program, he encountered immediate difficulty in handling the work and he did not take the final examination in Biology. It was not until the following semester that he completed this course and received a C. His performance in his other first semester courses was as follows: a C in Chemistry 120, a C in his writing course, and an incomplete in the Freshman Seminar. In the next semester he took Chemistry 220, a Freshman Seminar, and Psychology 504. He received a B in the Freshman Seminar, a C in Chemistry 220, but he withdrew from Psychology 504. He was advised at that time that he could not take the Patient Care course, usually given during the fall of an Inteflex student's second year, and he was placed on an irregular program. Because of these difficulties, at the July 14, 1976 meeting of the Promotion and Review Board he requested a leave of absence, and when this was approved, he left the program.

During the summer of 1976 while on leave, he took two Physics courses at Point Loma College in California. He reentered the Inteflex program at the University of Michigan in the winter 1977 term. In that term he repeated Chemistry 220 in which he received an A−. In the spring of 1977, he passed the Introduction to the Patient Care course.

In the 1977–78 year, he completed the regular Year II program. But then he encountered new difficulty. In the fall of 1978 he received an incomplete in Clinical Studies 400, which was converted to a Pass; a B in Microbiology 420; and an incomplete in Gross Anatomy 507. The Gross Anatomy incomplete was converted to a C− by a make-up examination. During the winter of 1979 he received a C− in Genetics 505, a C in Microbiology 520, an E in Microanatomy and General Pathology 506, a B in Creative Writing, and a Pass in Clinical Studies 410. He appealed the Microanatomy and General Pathology grade, requesting a

change from an E to a D, and a make-up exam to receive a Pass. His appeal was denied by the Grade Appeal Committee, and he was again placed on an irregular program; he took only the Clinical Studies 420 course in the spring 1979 semester.

In July 1979, Ewing submitted a request to the Promotion and Review Board for an irregular program consisting of a course in Pharmacology in the fall and winter 1979–80 and a course in Human Illness and Neuroscience in 1980–81, thus splitting the fourth year into two years. The Board denied this request and directed him to take the fourth year curriculum in one academic year. He undertook to do so. He removed his deficiency in Microanatomy and General Pathology 506 by repeating the course during the winter 1980 semester and received a C+. In the spring term of 1980 he passed Developmental Anatomy with a B– grade, and he received a C grade in Neuroscience I 509 after a reexamination. In the fall of 1980, he received a passing grade in Neuroscience 609 and Pharmacology 626, and in the winter term of 1981, he received a passing grade in Clinical Studies 510 and a deficiency in Pharmacology 627. He was given a make-up examination in this course, and he received a 67.7 grade.

He then took Part I of the NBME (National Board of Medical Examiners) examination. The NBME examination is administered by the Board of Medical Examiners, a proprietary organization which devises tests for licensure. Part I of the NBME examination must be passed before a student in the Medical School can reach the clinical stage of the program. Both regular medical students (known also as standard students) and students in the Inteflex program are required to take Part I of the NBME examination before continuing with clinical studies. Ewing received a score of 235; a score of 345 was required for a passing grade. His 235 score was not only the lowest score in his class, but the lowest score ever recorded by a University of Michigan student in the Part I examination. Because of this, on July 24, 1981, the Promotion and Review Board voted unanimously to drop him from registration in the program, noting that he had been earlier advised that any future deficiency would lead to dismissal.

On August 27, 1981, Ewing appealed the decision of the Promotion and Review Board to the Executive Committee. That Committee, having reviewed the record and having discussed the issues with Ewing and his representatives, Drs. Anderson and Shott, again unanimously affirmed the action of the Promotion and Review Board. It did so by approving a motion to deny Ewing's appeal for a request for a leave of absence status so that he could retake Part I of the NBME examination.

#### B.

The evidence indicates that since this NBME board program was instituted, thirty-two standard students in the Medical School who failed Part I of the NBME were permitted to retake the test. Of these thirty-two students, ten were allowed to take the test a third time, and one a fourth time. It also appears that seven students in the Inteflex program were allowed to retake the test, and one student was allowed to retake it twice. Ewing is the only student who, having failed the test, was not permitted to retake it.

Dr. Robert E. Reed, a former Director of the Inteflex program, and a member of the Promotion and Review Board, stated that students were routinely given a second chance absent other circumstances. It is because of this claimed disparity between Ewing and other students that Ewing argues that the decision of the defendants is arbitrary and capricious, and thus a violation of his substantive due process rights.

#### C.

Ewing was born in 1956. He graduated from high school in British Columbia in 1974 and, before entering the Inteflex program in the fall of 1975, he traveled somewhat and was also gainfully employed. In his application to the Inteflex program, he wrote:

I should be considered because of my personal and academic accomplishments which I feel demonstrate my suitability to the study of medicine. ... The academic aspects of medicine are particularly appealing to me. I decided to apply to your integrated pre-medical-medical program because of its unique emphasis on communication skills and the social problems of health care.

Yet, on March 8, 1976, his file reveals that Dr. Reed wrote to the Inteflex counseling staff, saying:

[Ewing's] record this past fall was deficient enough that he initially came to the attention of the Literary School's Administrative Board, although they accepted his appeal and allowed him to register for the winter term.

Later in 1976, Ewing was advised of the Interim Board's concern with his poor performance. A note in his record on May 7, 1976 states:

The way he has been behaving is viewed as much more alarming than the student is willing to admit to.

Because of this, he was given a leave of absence for the ensuing year. In a letter to the Board concerning this, he writes about the possibility of going to another school that "might be just the thing to rescue me from the throes of academic lethargy."

### D.

Earlier I commented on Ewing's academic difficulties. It is significant that it took him three years to complete the first two years of the program. It is also apparent that he had great difficulty in the "hard" science courses. It was directly as a result of having received an E in Microanatomy and General Pathology that he was placed on academic probation. He countered this with a request that he be put on an irregular program so as to lighten the load, and it is noteworthy that the Promotion and Review Board at this stage advised him that he could no longer cope by doing reduced work.

On July 30, 1980, Dr. Reed advised Ewing that because of his poor performance in Neuroscience 509, he had to take a reexamination. Dr. Reed wrote:

The Board was concerned that this may be an indication that the problems that previously led to your irregular schedule and difficulty in completing course work might be returning. The Board wishes to note these concerns to you and to remind you that any further deficiencies in the Program would be grounds for dismissal from registration.

In the winter of 1981, he received a Deficiency in Pharmacology, indicating that he was still having difficulty mastering his work. By the end of the winter 1981 semester, he had been in the Inteflex program six years, and he had only completed Phase I and Phase II (four years of the Program).

Ewing's discussion of his problems with the Promotion and Review Board on July 31, 1981 is also significant. The minutes note that Ewing reviewed the events of the previous year.

He noted that his mother's heart attack in the spring of 1980 had been a disrupting influence during the summer and early fall but that in spite of that he had performed satisfactorily throughout the fall term in what he described as the most difficult term in the curriculum. However, early in the winter term a 5½ year close relationship with his girl friend ended. Scott described this as having a greater negative effect on him than it should have primarily due to the length and closeness of the relationship and the fact that he had changed classes twice and therefore did not have the close relationship with classmates that other Inteflex students had who stayed with their classes.

He also noted that he had spent a great deal of time preparing a paper for the Hopwood Essay contest. He circulated this 100-page paper among the Board members for review. Mr. Ewing stated that in retrospect he should not have devoted this much time to his writing but that he felt a commitment to his instructor who had encouraged his work. Scott

said that the work on the paper and his personal crisis had caused him to get behind in his work in Human Illness and Pharmacology and that he was only beginning to recover by the end of the year. He cited his passing scores on the last examinations in Human Illness and Pharmacology as evidence that his performance was improving. He stated that the requirement for a make-up examination in Pharmacology was a great shock to him and that he was under a great deal of pressure because of the previous Board stipulations regarding further deficiencies. After successfully completing the Pharmacology make-up examination he only had ten days to prepare for the Boards. His background, the fact that he was further away from the basic medical science courses than other Inteflex students and the pressure to achieve made it very difficult for him to achieve a passing score. While taking the exam he realized that while the terminology was familiar to him, he was not prepared to pass it and a certain amount of "panic" set in which he believes made his score even lower than it would have been without this pressure.

Mr. Ewing reminded the Board of the time and effort he had already invested in the Program and his deep desire for a career in medicine. He cited the excellent clinical work that he has done circulating a patient work-up he had prepared in the Clinical Studies 400 course which had been described as excellent by Dr. Faith Fitzgerald and a recent paper prepared during his clerkship. These plus his honors grade in the Introductory Clerkship, Mr. Ewing said, was evidence of the level of clinical work of which he was capable. He asked for a second chance at the National Board test with adequate time to prepare.

Several of the Board members then asked Mr. Ewing questions. Dr. Murphy noted that a number of students in the Program have had very severe personal crises in their personal lives which had not affected their work to the degree that had Scott's and wondered why this had

had such an impact on him. Mr. Ewing replied that the long-term nature of the relationship and the fact that he had changed classes twice in the Program made his situation somewhat unique. Dr. Gershowitz noted that there were numerous instances in Mr. Ewing's record of having incompletes and make-up examinations to achieve a passing grade. He expressed concern that this pattern seemed to be continuing up to the present. Mr. Ewing agreed that this had been a pattern and he explained that it might be due to a lack of maturity, but stressed the fact that he had learned a great deal during this past year about himself and felt that the previous tendency to put things off and not be well prepared was now past him.

*Dr. Friedman asked if Mr. Ewing had been aware of the meaning of the letters that he had received which advised him that further deficiencies would lead to his being dropped from the Program or would be grounds for dismissal from the Program. Mr. Ewing said he was well aware of what those meant and in fact this had led to his being "under the gun" during his last two years in the Program. He reiterated that this may have been one factor in his low performance on the National Board examination because he realized the critical importance of passing.* (emphasis added).

There being no further questions, Mr. Ewing summarized his situation by reviewing the particular reasons for his poor performance during the past term, the evidence from his work of his ability to perform at the clinical level and his strong desire to continue toward a career in medicine.

Even after Ewing had been dropped from the program, the faculty offered to permit him to take a "shelf examination." This is an examination in which the faculty administers Part I of the NBME examination and the results can be used to make an application to another medical school; the results *cannot* be used for readmission to the University's Inteflex program. Ewing did not take this "shelf exam."

## II.

Ewing claims a violation of his substantive due process rights. In an amended complaint he claims that he is denied a protectible property interest in not being able to retake Part I of the NBME test and that this action on the part of defendants is arbitrary and capricious, primarily because while other students were allowed to retake the examination, he was not permitted to do so. He claims also that this decision is contrary to medical school accepted practice. He asks that he be reinstated as a student in good standing in the Inteflex program if, being permitted to take a reexamination of the Part I NBME test, he achieves a passing score. In Count II he alleges a contractual relationship with the University which he claims is materially breached in that he was dismissed after a single failure of the NBME Part I examination. In Count IV he sets up a claim of promissory estoppel. Count III has heretofore been dismissed by me since it seeks damages against the State contrary to the prohibitions of the Eleventh Amendment.

## III.

The basic issue is whether and to what extent academic decisions as to the qualifications of a medical student are subject to substantive due process review in this court.

The starting point of this inquiry is the United States Supreme Court's decision in *Board of Curators of the University of Missouri v. Horowitz,* 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978), in which the plurality opinion states:

> [In regard to substantive review] a number of lower courts have implied in dictum that academic dismissals from state institutions can be enjoined if "shown to be clearly arbitrary or capricious." *Mahavongsanan v. Hall,* 529 F.2d [448] at 449 [ (5th Cir.1976) ]. *See Gaspar v. Bruton,* 513 F.2d [843] at 850 [ (10th Cir. 1975) ], and citations therein. Even assuming that the courts can review under such a standard an academic decision of a public educational institution, we agree with the District Court that no showing

> of arbitrariness or capriciousness has been made in this case [footnote omitted]. Courts are particularly ill-equipped to evaluate academic performance. The factors discussed [above] with respect to procedural due process speak *a fortiori* here and warn against any such judicial intrusion into academic decisionmaking [footnote omitted].

*Id.* at 91–92, 98 S.Ct. at 956.

*Horowitz* did not directly settle the question whether courts can review academic qualification decisions on substantive due process grounds. Some lower courts have dealt with this uncertainty by finding on the facts that, even if such review is permitted, the claim of arbitrary or capricious action on the part of a medical faculty was not proven. For example, in *Stevens v. Hunt,* 646 F.2d 1168 (6th Cir.1981), the United States Court of Appeals for the Sixth Circuit was required to decide whether the dismissal of a number of students from medical school was arbitrary or capricious, and stated:

> The *Horowitz* decision still leaves open the question as to whether such a cause of action exists. Even if a cause of action does exist, it is clear, however, that arbitrary and capricious action on the part of the University officials would be a necessary element in order for plaintiffs to prevail. *Board of Curators v. Horowitz,* 435 U.S. 78, 91, 98 S.Ct. 948, 955, 55 L.Ed.2d 124 (1978).

> In order to establish such arbitrary and capricious action, the plaintiffs must show that there is no rational basis for the University's decision, *Greenhill v. Bailey,* 519 F.2d 5 [ (8th Cir.1975) ]; *Horowitz v. Board of Curators,* 447 F.Supp. 1102 (D.C.Mo.1975) or that the decision to dismiss was motivated by bad faith or ill will unrelated to academic performance. *Gaspar v. Bruton,* 513 F.2d 843.

*Id.* at 1170. The Court went on to hold that "[I]t cannot say that the dismissals were arbitrary and capricious. Therefore, the decision of the district court is affirmed." *Id.* The United States Court of Appeals for the Eighth Circuit disposed of a similar

claim in identical fashion in *Hines v. Rinker,* 667 F.2d 699 (8th Cir.1981).

Other post-*Horowitz* decisions have either tacitly or expressly concluded that *Horowitz* does allow such substantive review. *Dietz v. American Dental Ass'n,* 479 F.Supp. 554 (E.D.Mich.1979); *Aubuchon v. Olsen,* 467 F.Supp. 568 (E.D.Mo.1979); *Watson v. University of South Alabama College of Medicine,* 463 F.Supp. 720 (S.D.Ala.1979); *Bleicker v. Board of Trustees of the Ohio State University, College of Veterinary Medicine,* 485 F.Supp. 1381 (S.D.Ohio 1980). A recent Fifth Circuit decision not only allowed such review, but found that the academic decision in question was arbitrary and capricious in that it required students to be tested on materials which they had not been adequately taught. *Debra P. v. Turlington,* 644 F.2d 397 (5th Cir.1981).[1]

In determining the proper scope of substantive review of decisions involving academic qualification, I must consider the traditional relationship between courts and schools. In this relationship courts have usually adopted a "hands-off" posture. In commenting on the relationship between courts and medical schools, *Connelly v. University of Vermont,* 244 F.Supp. 156 (D.Vt. 1965), states:

> [I]n matters of scholarship, the school authorities are uniquely qualified by training and experience to judge the qualifications of a student, and efficiency of instruction depends in no small degree upon the school faculty's freedom from interference from other noneducational tribunals.
>
> . . . .
>
> A medical school must be the judge of the qualifications of its students to be granted a degree; Courts are not supposed to be learned in medicine and are not qualified to pass opinion as to the attainments of a student in medicine.

*Id.* at 160–161. Similarly, the court in *Keys v. Sawyer,* 353 F.Supp. 936 (S.D.Tex.1973), states:

University officials should have broad discretionary power to determine the fitness of a student to continue his studies. There is a compelling need and very strong policy consideration in favor of giving local school officials the widest possible latitude in the management of school affairs.

*Id.* at 940.

*Horowitz* demonstrates the continuing vitality of this hands-off approach in warning against judicial intrusions into such areas. 435 U.S. at 92, 98 S.Ct. at 956. Additionally, Justice Powell's concurrence in *Horowitz* recognized that:

> University faculties must have the widest range of discretion in making judgments as to the academic performance of students and their entitlement to promotion or graduation.

435 U.S. at 96 n. 6, 98 S.Ct. at 958 n. 6.

■ This is not to say that decisions as to academic qualification are not subject to substantive due process review. Throughout this century this constitutional requirement has constantly been interpreted as requiring both procedural and substantive compliance. *Kelley v. Johnson,* 425 U.S. 238, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976). So long as protected interests (life, liberty or property) are implicated, the Constitution mandates that due process, including all of its component parts, be accorded.

■ Traditional substantive due process review requires a court to scrutinize an action which may result in the deprivation of a protected right and strike it down if it is found to be arbitrary or capricious. This requirement is not so rigid, however, as to mandate the same scope and depth of review in every situation. Due process has proved to be an extremely flexible concept when applied to educational decisionmaking. In its common application, procedural due process normally requires notice and a hearing prior to the deprivation of a protected interest. In school disciplinary actions, the Supreme Court has held that all

---

1. *Debra P.* is not directly analogous to either *Horowitz* or this case in that it concerned academic decisions made by the state legislature and applied to high school students.

that is required is an informal "give and take" in which the student is provided with notice along with some opportunity to present his or her side of the story. *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). Moreover, in the case of dismissals because of a lack of academic qualification, the Supreme Court has held that procedural due process may require nothing more than prior notice. *Horowitz, supra.*

This same flexibility applies *a fortiori* to substantive due process areas. *Horowitz* clearly expresses the view that traditional substantive due process review is inappropriate in academic qualification decisions, saying that courts are ". . . particularly ill-equipped to evaluate academic performance." 435 U.S. at 92, 98 S.Ct. at 956.

Thus I conclude that the substantive due process review applicable to cases involving academic qualification decisions only allows me to scrutinize the objective factors which may have tainted or otherwise affected the decision, and not the propriety of the decision itself. Having concluded this, I could appropriately review whether such a decision was "motivated by bad faith or ill will unrelated to academic performance." *Stevens,* 646 F.2d at 1170. Likewise, I could also review whether the decision was based on arbitrary or capricious factors which are not reasonably considered to be academic criteria. But, I am not permitted to review the ultimate academic qualification decision which has been made in a "careful and deliberate" manner, *Horowitz,* 435 U.S. at 85, 98 S.Ct. at 952, and not influenced by ill will or ulterior purposes. Put another way, if all that went into the academic qualification decision complied with substantive due process, this would constitute per se proof that the decision reached is in accord with substantive due process. I thus will not and cannot examine, in any manner, the decision itself.

Such a rule is supported by *Horowitz's* admonition and warning against the use of traditional substantive due process review. This rule is also supported by direct precedent. In *Gaspar v. Bruton,* 513 F.2d 843 (10th Cir.1975), the court stated:

The courts are not equipped to review academic records based upon academic standards within the particular knowledge, experience and expertise of academicians. Thus, when presented with a challenge that the school authorities suspended or dismissed a student for failure re academic standards, the court may grant relief, as a practical matter, only in those cases where the student presents positive evidence of ill will or bad motive.

*Id.* at 851.

This type of limited review represents the only practical and workable judicial approach to academic qualification decision-making. While courts may be loath to step in and regrade an essay exam or evaluate the merit of a curriculum, such a review, however ill-advised, could be accomplished. But in certain areas, such as the evaluation of the clinical performance of a medical student, courts are completely unable to afford review in that the evidence of the performance, the student's actual functioning in a clinical experience, can no longer be directly observed and evaluated. Thus, it is for prudential as well as pragmatic reasons that the propriety of academic decisions cannot be reviewed.

Such limited review will protect the interests of educators as well as those of students. It will afford colleges, school boards, and teachers the traditional broad range of autonomy which they need in order to tend to the business of education. At the same time it will protect the student from actions which are tainted by any arbitrary and capricious non-academic considerations.

Accordingly, I find that defendants did not act in violation of Ewing's due process rights. There have been no allegations offered to the effect that defendants' decision was based on bad faith, ill will or other impermissible ulterior motives. The evidence demonstrates that the decision to dismiss plaintiff was reached in a fair and impartial manner, and only after careful and deliberate consideration.

·· To leave no conjecture as to my decision, even under a traditional substantive due process review, I find that the evidence demonstrates no arbitrary or capricious action since the defendants had good reason to dismiss Ewing from the program.

█ I also reject the contract and promissory estoppel claims, finding no sufficient evidence to conclude that the defendants bound themselves either expressly or by a course of conduct to give Ewing a second chance to take Part I of the NBME examination. Ewing contends that the pamphlet "On Becoming A Doctor," which states that a qualified student would be given a second chance to take the NBME, gives him a contractual right to do so. Even if he had learned of the pamphlet's contents before he took the examination, and· I.find that he did not, I would not conclude that this amounted either to an unqualified promise to him or gave him a contract right to retake the examination.

Accordingly, I find in favor of the defendants and against the plaintiff on all counts. An appropriate order may be entered.