Dorothy GASPAR, Plaintiff-Appellant,

v.

John C. BRUTON, Individually and as Superintendent of Gordon Cooper Area Vocational-Technical School, et al., Defendants-Appellees.

No. 74–1197.

United States Court of Appeals, Tenth Circuit.

Argued Nov. 14, 1974.

Decided April 10, 1975.

---

844

Stephen Jones, Oklahoma City, Okl., for plaintiff-appellant.

J. C. Winterringer, Shawnee, Okl., for defendants-appellees Greer, Brown, Weaver, Dollar and Coursey.

Wm. G. Smith, Oklahoma City, Okl., for defendants-appellees Burton, Hill, Grider, Mathis and Garrison.

Before SETH, BARRETT and DOYLE, Circuit Judges.

BARRETT, Circuit Judge.

Dorothy Gaspar (Gaspar) appeals from the Trial Court Order granting the defendants'-appellees' (hereinafter jointly and individually referred to as "School" for convenience) Motion for Summary Judgment and Dismissal of her cause of action based upon the pleadings, detailed "discovery" materials, and hearings. Gaspar's suit was initiated when she was dismissed as a student.

## FACTS

Gaspar was a student at Gordon-Cooper area Vocational-Technical School pursuing courses, studies and practical training in the Division of Practical Nursing at Shawnee, Oklahoma, from February to November, 1973. Mrs. Gaspar was about 44 years of age when she enrolled in the program. She had married following completion of her high school studies. Her husband had been employed at Tinker Air Field, Oklahoma City, for 25 years. She and her husband have two married daughters, one 28 years of age and one 17. Only one child, a son, resides at the family home in Meeker. He is age 13. Gaspar had been a housewife from the date of her marriage until enrolling in the School program.

School is publicly owned, tax supported. The defendants-appellees, sued individually and in their official capacities, are members of the Board of Directors, the Superintendent, administrative and faculty personnel of the School.

Gaspar and each of the defendants-appellees are citizens of the State of Oklahoma. Gaspar paid the requisite enrollment fees to the School and maintained adequate academic grade points in the objective or classroom portion of the course, i.e., written tests and examinations. The balance of the course involved clinical training, i. e., working with patients in clinical facilities, under supervision. On an annual twelve-month school year basis the course consists of about 725 classroom hours and about 834 clinical training hours covering three trimesters, the last of which involves clinical training exclusively. Gaspar had completed more than two-thirds of the program at the date of her dismissal.

School's Student Manual provides that supervised clinical experience is to be evaluated by the "school faculty". The Manual, under the heading of "Conduct" provides that *any disciplinary action necessary may be taken by the faculty but dismissal from the school of nursing for any reason will be acted upon only after consultation with the staff  . .."* Under the heading of "Withdrawal and Dismissal" it is provided, inter alia, that *"the faculty reserves the right to dismiss at any time a student whose health, work or conduct demonstrates any lack of fitness to continue the program."* Under the heading of "Graduation Information" it is provided that "Satisfactory scholastic average and clinical performance must be achieved." In regard to the clinical performance requirement, the manual recites that upon completion of Trimester III (the final four months of the course), the student "should be able to" assist the patient in identifying and talking about problems, utilize problem-solving in planning and implementing patient care, identify, plan for, and meet the nursing needs of patients of all ages, assist patients in a health crisis, establish and maintain a therapeutic environment, identify and accept the feelings, thought and behaviors of self and others, etc.

Gaspar was placed on probation, September, 1973. At that time she was advised that she would be dismissed if the various clinical deficiencies she had been counseled about were not corrected.

When the dismissal of Gaspar was ultimately determined necessary, a conference was held in Superintendent Bruton's office. Dr. Bruton, Mrs. Mathis, Mrs. Grider, Mrs. Hill and Gaspar were present. The discussion was full, direct, and frank, although informal. Gaspar was informed of her dismissal on November 6, 1973. She met with the School Board that evening in the company of her husband. The Board requested that she appear before Superintendent

Bruton for a hearing on her complaint, at which time she and Dr. Bruton could fully and independently interrogate the faculty and others.

When Gaspar met with Dr. Bruton on November 7th, he detailed to her the causes for her dismissal and he then informed her that Mrs. Hill, Mrs. Grider, and other staff-faculty members were in his outer office, available to be questioned so that there could be a complete discussion relating to the dismissal causes. He advised Gaspar she was free to say anything or make any inquiries. Gaspar rejected the conference invitation. She elected to confer solely with Dr. Bruton. She stated that it was her choice not to meet or to talk with anyone else because "Everything has been already said, everybody knows who feels how about what . . . I don't see any point in dragging it out."

On November 23, 1973, Gaspar brought this suit, alleging deprivation of her right to due process of law guaranteed her under the Fourteenth Amendment to the United States Constitution, in that the dismissal was unreasonable, arbitrary and capricious, and that she was deprived of a *property right* "paid for and worked for without consultation, notice, hearing or other element of due process, or any sufficient legal cause for dismissal . . . ." (R., Vol. I, p. 4).

Gaspar's complaint claimed jurisdiction pursuant to: (1) 28 U.S.C.A. § 1343 (to redress alleged deprivation of rights secured to her by the Constitution or laws of the United States under color of Oklahoma state law, regulation, custom or usage); (2) 28 U.S.C.A. § 2201 (praying for declaratory judgment of her rights); (3) 28 U.S.C.A. § 2202 (further relief in the nature of order of reinstatement as student); and (4) 42 U.S.C.A. § 1983 (alleging that defendants-appellees, individually and jointly under color of law, regulation, custom or usage of the State of Oklahoma deprived her, as a citizen of the United States, of rights guaranteed her by the Constitution of the United States) violative of her contractual and due process rights. She alleged that she was denied her contractual and due process rights in: (1) that she was dismissed as a student without any just cause; (2) that she was not provided rights in conformance with the rules established in the School's students' pamphlet; and (3) that minimum standards of due process were denied her prior to her dismissal in that she was not accorded the right to be confronted with evidence relied upon to support the dismissal, that she was not accorded the right to cross-examine and challenge any evidence purportedly relied upon for her dismissal, and that she was not accorded the right to present evidence in her defense. She further alleged that her dismissal was without sufficient legal cause.

School acknowledged that Gaspar adequately completed the classroom courses and examination, but contended that she incompetently and unsatisfactorily performed the clinical training program portion of the course in the conduct of her clinical duties with patients and that, accordingly, her continuation in the program would create an unreasonably unsafe and dangerous medical atmosphere for the patients. Furthermore, School alleged that Gaspar received counseling, instructions and guidance as to her deficiencies, but that no improvement on her part occurred; that the dismissal followed consultations with the faculty and staff of the School; that Gaspar was provided a hearing before the Board of Education, followed by an unreported hearing before the Superintendent with an opportunity accorded her to be confronted by faculty and staff, and to freely present her position; and that thereafter a formal, reported hearing was held before the Board, with full opportunity accorded Gaspar to present her views and pose her objections to the dismissal, call any witnesses, and to be confronted with and examine any witnesses against her.

School filed its Motion to Dismiss and Motion for Summary Judgment alleging, inter alia, that there "is no justicable controversy as to the material facts . . . .", with attached exhibits and brief in support thereof.

An evidentiary hearing was held on January 4, 1974, on the motion for temporary restraining order, the motion for permanent restraining order, the motion to dismiss and for summary judgment, at which time the only testimony offered was that of Gaspar, in view of the uncontroverted statement by the Court that it had conducted two prior lengthy hearings and had considered the prior deposition of Gaspar together with the transcript of the hearing held before the Board on December 18, 1973, at Gaspar's request which involved detailed testimony, subject to cross-examination.[1]

The hearing involved many exhibits and testimony from School witnesses:

*Joyce Abel,* R.N., Director of Nursing at Mission Hospital in Shawnee, who supervised and observed Gaspar's clinical work testified that Gaspar was "a very nervous person" and that she continually tried to upgrade herself in the nursing field by her conversation; that the staff reports were adverse in many areas in that Gaspar did not have the ability to organize and complete her assignments, and that she could not, in her opinion, perform adequately as a Practical Nurse.

*Genevieve Harrison,* Chief R.N. in the newborn nursery of Shawnee Medical Hospital, who supervised and instructed Gaspar in that area testified that she gave Gaspar extra instructions, without avail, intended to correct Gaspar's unsafe handling of newborns via several specific personal examples; and that, in her opinion, Gaspar is not qualified to put into practice good practical nursing procedures.

*Loretta Holland,* R.N. in charge of the OB-Gyn Department of Shawnee Medical Center Hospital, who observed Gaspar for about three weeks in the 16-bed unit testified that Gaspar would not listen to instructions; would not undertake procedures to assure maintenance of proper blood pressure; would not properly prep and clean the Gyn patients before surgery; and that Gaspar, in her opinion, could not properly function as a practical nurse.

*Jerri Wolfinbarger,* an R.N. employed by School as Clinical Instructor at the Mission Hill Hospital, who observed Gaspar for about two weeks in different areas testified that she personally observed that Gaspar was very nervous with patients, a condition which persisted from June to October, involving an inordinate and unusual amount of nervous talking by Gaspar in the presence of the patients, which is not satisfactory for proper performance as a P.N.

*Frances Mathis,* an R.N. member of the faculty at School, employed as an instructor in theory and clinical areas involving basic concepts of nursing testified that Gaspar had difficulty arranging her work to meet her time; that she did not properly complete patient charts; that she was very talkative; that she did not follow instructions; that regardless of the fact that she was about a B stu-

---

1. It should be pointed out that although suit was filed on November 23, 1973, the Board honored Gaspar's request for further review and hearing made through her attorney before the Board of Education as to her dismissal from the program.

In setting a specific hearing date relative to her dismissal, the Superintendent listed Gaspar's alleged basic deficiencies, as per her request, which related entirely to that portion of the program involving her work with patients, contending failure to: (1) organize assignments so as to complete them on schedule without constant reminding and supervision; (2) apply proper safety measures in patient care and properly observe patients during recovery from surgery; (3) properly assist patients' basic needs, including proper use of bed-rails and providing oxygen; (4) adequately check and examine patients, particularly in the obstetrical field; (5) employ proper procedures in dealing with patients suffering from infections or contagious conditions so as to protect either herself or others from the dangers thereof; (6) accurately chart the patients' medical records on repeated occasions; (7) recognize a health crisis and protect and assist the patient; (8) establish and maintain proper medical and surgical asepsis, including handling of newborn infants; (9) practice correct use of body mechanics, as taught, in work activities and patient care; (10) eliminate nervousness and nervous talking in the presence of patients and when doctors, nurses, and teachers are attempting to give orders, directions and instructions.

dent in classroom work, she could not carry out the classroom fundamentals in relation to clinical performance procedures regardless of the counseling services accorded her; and that Gaspar could not, in her opinion, carry out safe nursing procedures.

*Pearl Hill*, an R.N., Director of the Practical Nursing Program at School testified that records and evaluation reports concerning Gaspar contain complaints from instructors, nursing personnel and other students relating to her unsafe nursing care and manner, all of which are part of a student's evaluation record of performance in a clinical situation; that she personally observed and counseled with Gaspar together with Mrs. Grider, relative to OB clinical practices by Gaspar which were so unsafe that the life of the patients were, in her opinion, at issue; that the counseling often involved Gaspar's "personal problems" which Gaspar said she could not deal with; that Gaspar was not able to cope with the problems she was having in the clinical area relating to the care of patients because she was very nervous, talked and mumbled too much in the presence of patients; that there were a number of other practices by Gaspar which she considered unsafe, including her failure to chart the condition of the patients; and that when she and Mrs. Grider counseled with Gaspar that she (Gaspar) was not aware of her problem.

Both Hill and Grider testified that they had recommended personal counseling to Gaspar which she had once agreed to, but did not pursue with either a psychologist or psychiatrist, even though, according to Mrs. Hill, Gaspar's family physician, Dr. Johnson, had recommended such counseling to Gaspar about the middle of August, 1973.

Each of the witnesses called by School were extensively cross-examined, as previously requested by counsel for Gaspar. In the letter from her attorney requesting the Board hearing, he asked that in addition to Gaspar's request for permission to cross-examine witnesses called by the Superintendent that she be permitted to attend, personally testify, and to present witnesses on her behalf. *Each request was granted.* In addition, the Board's attorney informed her prior to the hearing that any witnesses she desired to make inquiry of on the Faculty, Staff, the Superintendent, or any of the five members of the Board of Education, would be present and available to testify at her request. Gaspar was then aware of the fact that the Superintendent planned to call Abel, Harrison, Holland, Mathis, Wolfinbarger and Hill. The parties understood that the purpose of the formal hearing, as per Gaspar's request, was to determine whether cause existed for her dismissal. A deposition of Gaspar taken December 12, 1973, six days prior to the Board hearing, was not offered at the hearing.[2] The suit at bar had already been filed and the deposition was offered and admitted in evidence by the Trial Court in relation to the Motion here appealed from.

At the Board meeting of December 18, 1973, Gaspar alone testified on her side of the issue of dismissal. She did not call any witnesses on her behalf. Gaspar generally denied the alleged clinical deficiencies attributed to her or otherwise explained them away as a "joke", or that they had been corrected; that the September 3rd meeting conveyed to her "in

---

**2.** In a deposition of December 12, 1973, Gaspar testified, inter alia, that she has always had nervous tension and that she feels the "most nervous" when "I am on the spot"; that she understood that she would be graded and evaluated relative to her clinical performance; that with respect to bad charting procedure, she admitted that she had some initial problems, but that she had corrected them; that in regard to being too talkative, that she also had corrected that; that she did not believe other inadequacies attributed to her were correct; and she believed that her patients appreciated her work. She further testified that she cancelled an appointment with a psychologist, made on November 6th, after conferring with Mrs. Hill on November 5th, and that, in so cancelling, she stated to the Health Center receptionist that it appeared to her that Mrs. Hill was running the Health Center too; and that she felt that Mrs. Hill was "diagnosing" but was not so qualified to do.

a manner of speaking" that she was on "probation"; that "mistakes" in clinical practice attributed to her were really not made by her; that in the Obstetrics Department she was under pressure because she had a personality conflict with Mrs. Holland; that during the latter part of the clinical training, i.e., September, October and November, she had a better understanding of how to cope with patients; that she did not have the one and one-half hour conference with Dr. Johnson; that she and Mrs. Hill do not see "eye to eye" on anything; that while she was talking too much at one time, she corrected the situation; and that she believed she was performing on a level similar to other students in the clinical area. She acknowledged that she has "always" been a nervous person, and that she had been taking Vallium since undergoing surgery in 1969.

At the conclusion of the December 18, 1973, hearing the Board, through its chairman, stated that after considering all of the testimony and exhibits, including Gaspar's personnel file, it had voted unanimously to uphold Gaspar's dismissal.

## TRIAL COURT DISPOSITION

In entering the Order of January 30, 1974, denying Gaspar's application for restraining orders, the Court, on the merits, ordered judgment in favor of all defendants, individually and in their official capacities (School) and directed that the action be dismissed. The Court found: (1) that Gaspar's termination was not without probable cause; (2) that there was no violation of Gaspar's constitutional rights; (3) that the Court will not interfere with the legal and academic standards of School in determining the qualification, professional standards and ability of a student; (4) that there is no diversity of citizenship between the parties; and (5) that by reason of the above the Court is without jurisdiction.

## CONTENTIONS OF APPELLANT

Gaspar presents four major issues on appeal, to-wit: (1) that she was not accorded minimum standards of due process before being dismissed; (2) that the granting of a hearing subsequent to dismissal is not constitutionally sufficient under the due process clause; (3) that the alleged denial of the constitutional right of due process of law is subject to remedy by federal courts; and (4) that the Trial Court erred in granting the motion for summary judgment in view of the fact that there existed material issues of fact.

I.

The Trial Court found that Gaspar's termination was not without "probable cause" and that there had been no violation of her constitutional rights. Gaspar challenges these findings on the grounds of a lack of sufficiency of the evidence in light of Gaspar's contractual rights and/or her right of liberty and due process of law. She urges reversal, contending that the Constitution provides that she was entitled to a proper hearing, with notice, meeting mandates of the due process clause prior to her termination. Gaspar argues that at the heart of this argument is the issue whether schools are to be permitted "sporadic and discretionary enforcement" of their rules. She urges upon us that: (a) she was unlawfully deprived of an education—under a valid property right in contract; and (b) she was deprived of a significant right of liberty by denial of a proper hearing prior to her dismissal.

This case *does not* involve a student disciplinary matter in the nature of misconduct, immorality, or refusal to conform to dress, hair grooming, or other regulations pertaining to personal appearance or refusal to participate in prescribed rituals, i.e., oath of allegiance, salute to the flag, exercises of a patriotic character, deportment or aggressive, disruptive actions.

The contentions of the appellant deal basically with the Due Process Clause of the Fourteenth Amendment. The trial court's finding that there had been no violation of Gaspar's constitutional rights was, as we see it, decisive. We shall

direct our remarks exclusively to that issue. We need not reach others. The Due Process issue is dispositive.

In Goss v. Lopez, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (January 22, 1975), the Supreme Court held that the Due Process Clause of the Fourteenth Amendment mandated that high school students who are to be suspended not to exceed ten days for disciplinary reasons must first be given oral or written notice of the charges, and, if denied, an explanation of the evidence the school authorities have. The students then must be given an opportunity to present their version. The Court observed that the State of Ohio had established a public school system and has required its children to attend. Of significance here, the Court observed, inter alia:

> The authority possessed by the State to prescribe and enforce standards of conduct in its schools, although concededly very broad, must be exercised consistently with constitutional safeguards. Among other things, the State is constrained to recognize a student's legitimate entitlement to a public education as a *property interest* which is protected by the Due Process Clause and which may not be taken away for mis-conduct without adherence to the minimum procedures required by the clause. [Emphasis supplied].

419 U.S. 574, 95 S.Ct. at 736.

And:

> . . . the interpretation and application of the Due Process Clause are intensely practical matters and . . 'the very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation.' Cafeteria Workers v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961).

419 U.S. 578, 95 S.Ct. at 738.

■ We have no difficulty in concluding that in light of Goss, supra, where the Supreme Court recognized a *property right* in public school students that certainly such a right must be recognized to have vested with Gaspar, and the more prominently so in that she paid a specific, separate fee for enrollment and attendance at the Gordon Cooper School. The cause is, then, cognizable under the Civil Rights Act.

## II.

■ Governing officials of a school required to examine students and determine whether they have performed the conditions entitling them to a diploma or other evidence of a completion of the course of study, exercise quasi judicial functions. In such capacity, their decisions are conclusive, providing that their action has been in good faith and not arbitrary. 6 A.L.R. 1533 and cases cited therein.

■ In Barnard v. Inhabitants of Shelburne, 216 Mass. 19, 102 N.E. 1095 (1913), the Court held that a student challenging the determination of the school committee that he be excluded from attendance for failure to maintain a proper standard of scholarship has the burden of showing bad faith on the part of the school committee by evidence and not merely by surmise, conjecture or speculation. The Court observed that the issue did not involve disciplinary conduct but rather academic conduct and that in matters involving educational delinquencies of students the final determination vests in those public officials charged with the performance of that important determination. We agree.

■ Courts have historically refrained from interfering with the authority vested in school officials to drop a student from the rolls for failure to attain or maintain prescribed scholastic rating (whether judged by objective and/or subjective standards), absent a clear showing that the officials have acted arbitrarily or have abused the discretionary authority vested in them. 39 A.L.R. 1019; Foley v. Benedict et al., 122 Tex. 193, 55 S.W.2d 805 (1932); Anno. 86 A.L.R. 484.

■ Gaspar was provided much more due process than that which we

hold must be accorded in cases involving academic termination or suspension. We hold that school authorities, in order to satisfy Due Process prior to termination or suspension of a student for deficiencies in meeting minimum academic performance, need only advise that student with respect to such deficiencies in any form. All that is required is that the student be made aware prior to termination of his failure or impending failure to meet those standards.

 The courts are not equipped to review academic records based upon academic standards within the particular knowledge, experience and expertise of academicians. Thus, when presented with a challenge that the school authorities suspended or dismissed a student for failure re academic standards, the court may grant relief, as a practical matter, only in those cases where the student presents positive evidence of ill will or bad motive. As so succinctly pointed out in Greenhill v. Bailey, 378 F.Supp. 632, 635 (S.D.Iowa 1974), "The absence of such evidence coupled with the authorities' discretion to determine scholastic grades requires a decision in favor of defendants."

In Connelly v. University of Vermont and State Agricultural College, 244 F.Supp. 156 (D.C.Vt.1965), the Court held:

> Whether the plaintiff should or should not have received a passing grade for the period in question is a matter wholly within the jurisdiction of the school authorities, who alone are qualified to make such a determination.

244 F.Supp. 156 at 161.

We affirm.