## Subbiondo v. Temple University

*Thomas B. Rutter,* for plaintiff.
*George E. Moore,* for defendant.

WILSON, *J.,* August 5, 1981 — And now, after trial and consideration the court renders its decision by way of this adjudication making the following findings of fact, conclusions of law and entering the attached decree nisi:

## FINDINGS OF FACT

1. Plaintiff, Joseph Subbiondo, enrolled as a student in the Ph.D. program of the Graduate English Department of Temple University of the Commonwealth System of Higher Education in September 1966. He passed his preliminary examinations for the Ph.D. degree in December 1969.

2. Defendant, Temple University of the Commonwealth System of Higher Education, is an institution of higher education accredited and authorized to award the degree of Doctor of Philosophy.

3. The University awards its degree of Doctor of Philosophy upon the recommendation of the Graduate School of the University. The recom-

mendation of the Graduate School is, in turn, based upon the recommendation of the faculty of that department in the Graduate School in which the student seeking the degree is enrolled.

4. At all relevant times, the Graduate Faculty of the Department of English consisted of those persons who taught graduate level courses in the Department of English. The Graduate Committee of the Department of English consisted of members of the Graduate English Faculty who held the academic rank of Professor.

5. The recommendations of the Graduate School and the Graduate English Faculty for the award of the Ph.D. degree are based primarily upon their respective academic evaluations of the student's knowledge of his particular subject and the student's preparation to advance knowledge in that subject by his own investigations. The recommendations are not granted automatically upon the student's completion of a given number of courses or other formal requirements.

6. The rules, requirements and policies of the University's Graduate School, including the requirements and procedures prerequisite to the recommendation of the Graduate School for an award of a Ph.D., are formulated by the Graduate Board. The Graduate Committee (full graduate English professors) propose the requirements to the Graduate English Faculty (all graduate English teachers) who further recommend to the Graduate Board for final formulation the requirements for the award of a Ph.D. in English.

7. The rules, requirements and policies of the University's Graduate School, including those requirements and procedures prerequisite to the recommendation for an award of a Ph.D., are set forth in various publications, including the Handbook

for Doctor of Philosophy Students and the Graduate School Bulletin.

8. Beginning in 1968, the rules, requirements and policies of the Graduate English Faculty, including those requirements and procedures prerequisite to the Graduate English Faculty's recommendation for an award of a Ph.D, as well as rules, requirements and policies of the Graduate School as a whole were compiled and set forth in publications known as the "Rule Hoard." The Rule Hoard was amended and revised from time to time.

9. It is the sole responsibility of the student seeking an award of the University's Ph.D to apprise himself of and to follow the requirements and procedures prerequisite to the recommendation of the faculty of his department and the Graduate School for the award of a Ph.D. degree.

10. At all relevant times, among the written requirements and procedures prerequisite to the recommendation of the Graduate English Faculty and the Graduate School for an award of a Ph.D. degree were the following:

(a) registration for at least three credit hours of work each semester until the final award of the degree (unless official leave of absence is granted);

(b) formation and approval of the Graduate Committee of a dissertation committee consisting of a dissertation advisor who is a member of the Graduate English Faculty and two other members of the Graduate English Faculty;

(c) completion of a formal dissertation proposal for submission to and approval by the student's dissertation advisor, his dissertation committee and the Graduate Committee;

(d) recommendation of the student for candidacy for the Doctorate of Philosophy from the Graduate English Faculty to the Graduate Board;

(e) submission to and approval of each section of the dissertation by each of his dissertation committee members as each section is completed;

(f) approval of the dissertation by the dissertation committee; and

(g) passage of the oral defense of the dissertation.

11. As a student, Mr. Subbiondo was or should have been familar with the requirements set forth in the Graduate School Bulletin, the Handbook for Doctor of Philosophy Students, and the Rule Hoard. He was aware, or should have been aware of the requirements and procedures prerequisite to the recommendation of the Graduate School for an award of a Ph.D, as those procedures were set forth in those documents.

12. After passage of his preliminary examinations in December 1969, Mr. Subbiondo chose to ignore completely the written requirements and procedures prerequisite to the recommendation of the Graduate English Faculty and Graduate School for the award of the Ph.D.

13. At no time has Mr. Subbiondo fulfilled the requirements and procedures prerequisite to the recommendation of the Graduate English Faculty for an award of a Ph.D. degree. Mr. Subbiondo failed, among other things, to (a) maintain his registration as a student, (b) give notice of intended graduation, or (c) pay the required graduation fees at any time during that academic year. In addition, he failed to secure the recommendation of the Graduate English Faculty for the conferral of Candidacy for the Doctorate of Philosophy at any time prior to the end of that academic year.

14. At all relevant time, the Graduate English Faculty approved of dissertation proposals, dissertation supervisors and dissertation committee

members through a process whereby a formal dissertation proposal with the names of the supervisor and committee members was circulated to the Graduate English Faculty for approval.

15. Although Mr. Subbiando claims to have completed all of the requirements for the award of a Ph.D. prior to June of 1972, at no time prior to the fall semester of 1972 did Mr. Subbiondo form an approved dissertation consisting of three members of the Graduate English Faculty.

16. At no time prior to the spring semester of 1973 did Mr. Subbiondo complete a formal dissertation or submit such a proposal to his dissertation advisor, dissertation committee or to the Graduate English Faculty for their approval. Hence, at no time prior to the spring semester of 1973 was a dissertation proposal of Mr. Subbiondo approved by his dissertation advisor, his dissertation committee or the Graduate English Faculty.

17. From January 1970 through June 1972, Mr. Subbiondo merely corresponded about his dissertation project with Dr. Dennis Lebofsky, a junior member of the Graduate English Faculty who only recently had received his own Ph.D. and whom Mr. Subbiondo desired to be his dissertation supervisor. However, Mr. Subbiondo did not take the required steps to secure the approval of the Graduate English Faculty of his choice for a dissertation advisor.

18. Although he was aware, or should have been aware, of the requirements and procedures prerequisite to the award of the Ph.D. degree as set forth in the Rule Hoard, the Graduate School Bulletin and the Handbook for Doctor of Philosophy Students, Mr. Subbiondo never took any steps or made any effort to see that those requirements and procedures were followed in his case. Dr. Lebofsky

had neither actual nor apparent authority to waive any of those requirements or procedures with respect to Mr. Subbiondo's dissertation.

19. In May 1972, Mr. Subbiondo submitted a complete draft of his dissertation to Dr. Lebofsky and to two other individuals, Dr. Howard Meroney and Mr. Kenneth Schaefer, neither of whom were told they were to be members of a dissertation committee. At the time, Mr. Schaefer was ineligible to serve as a member of a dissertation committee since he was not a member of the Graduate English Faculty and had not yet obtained his own Ph.D.

Dr. Lebofsky could not, nor could anyone else, waive the written requirement of the Graduate English Faculty that all members of Mr. Subbiondo's dissertation committee must be members of the Graduate English Faculty.

20. Mr. Subbiondo had never submitted a formal dissertation proposal to his first "committee" for its approval, nor had he secured the approval of the Graduate English Faculty of his advisor, committee or proposal. Neither had Mr. Subbiondo submitted the chapters of his dissertation, as they were completed, to that "committee" for approval of each section by each member.

21. When, in the fall of 1972, the Graduate Committee and English Department first learned that Mr. Subbiondo had undertaken to write a Ph.D. dissertation, without registering for courses or securing the Graduate English Faculty's recommendation for conferral of candidacy for the Doctorate of Philosophy or otherwise complying with its requirements, it afforded Mr. Subbiondo more than reasonable opportunity to regularize his situation and to revise his dissertation so as to satisfy the academic standards of an approved disser-

tation committee and the Graduate English Faculty.

22. An approved dissertation committee for Mr. Subbiondo was formed during the 1972-1973 academic year when Drs. Lebofsky and Meroney and Dr. Anne Matonis, all members of the Graduate English Faculty, were selected and approved in the requisite fashion.

23. At no time was Mr. Subbiondo's dissertation as a whole approved either by Dr. Meroney or Dr. Matonis, two of the three members of Mr. Subbiondo's dissertation committee, as meeting the academic standards of the Graduate English Faculty. The only member of the Graduate English Faculty ever to approve of Mr. Subbiondo's dissertation was Dr. Lebofsky.

24. Although the Rule Hoard as amended in 1969 stated, in part, that following approval of each section by *all* members of a dissertation committee "[t]he dissertation as a whole must be approved by a committee majority," no student has ever been recommended by the Graduate English Faculty for the award of a Ph.D. degree with less than unanimous approval of his dissertation by his dissertation committee. In the spring semester of 1972, *before Mr. Subbiondo completed a draft of his dissertation, or submitted a completed draft* to any member of the Graduate English Faculty, the Rule Hoard was amended to reflect that practice of requiring unanimous approval. This amendment had no impact on this plaintiff, since Mr. Subbiondo neither gained approval of each section by all members of a dissertation committee (he submitted his as a whole), nor did he gain majority approval of his dissertation (Mr. Schaefer was never qualified to approve; Drs. Meroney and Matonis never approved; only Dr. Lebofsky approved).

25. All other students who submitted completed drafts of dissertations to the Graduate English Faculty in the spring semester of 1972 and thereafter (including the 1972-1973 academic year) were required to obtain unanimous approval by an approved dissertation committee.

26. Mr. Subbiondo failed and refused to revise his dissertation so as to meet the academic standards of his dissertation committee and the Graduate English Faculty.

27. To give Mr. Subbiondo the benefit of the doubt as to the merit of his dissertation as it stood, the University, with Mr. Subbiondo's approval, sought and obtained an opinion of the academic merit of Mr. Subbiondo's dissertation by an impartial "fourth reader," who was neither connected with the University nor aware of the status of the dissertation. That "fourth reader," Dr. Samuel Keyser of the University of Massachusetts, concluded that the dissertation was not academically acceptable.

28. Mr. Subbiondo has never taken or passed the final examination for the Ph.D. degree, commonly known as the oral defense of his dissertation.

29. The decision of the Graduate English Faculty not to recommend Mr. Subbiondo for the award of the University's Ph.D. degree was solely an academic determination on a matter of scholarship, competence and achievement.

30. That academic determination was not arbitrary or capricious nor made in bad faith. It was arrived at honestly, with due consideration and was based upon valid and substantial reasons, including: (a) Mr. Subbiondo's failure to submit a dissertation meeting the academic standards of the Graduate English Faculty; (b) Mr. Subbiondo's failure to register; (c) Mr. Subbiondo's failure to

give written notice of his intention to graduate or to pay the required fees; (d) Mr. Subbiondo's failure to form a dissertation committee of members of the Graduate English Faculty; (e) Mr. Subbiondo's failure to submit and get approval of a dissertation proposal; (f) Mr. Subbiondo's failure to submit to the sections of his dissertation to his committee as they were completed; and (g) Mr. Subbiondo's failure to receive unanimous (or even majority) approval for his dissertation as a whole by an approved dissertation committee of the Graduate English Faculty.

31. The University did not act in bad faith, nor with ill will, nor arbitrarily and capriciously, in not awarding him a Ph.D.

## CONCLUSIONS OF LAW

1. The unique relationship between a student and a university involves some elements of contract. To the extent that the relationship between Mr. Subbiondo and Temple University was contractual, the terms of the "contract" are found, among other places, in the University's publications. It was the duty and responsibility of Mr. Subbiondo to apprise himself of and to follow the requirements and procedures set forth in those publications.

2. Mr. Subbiondo has failed to sustain his burden of proof that he satisfied all the requirements and procedures prerequisite to his obtaining the recommendation for the award of the Ph.D. by the Graduate English Faculty and the Graduate School by June 1972 or any time whatsoever.

3. Mr. Subbiondo has failed to meet his burden of establishing by positive evidence that the decision of the Graduate English Faculty not to recommend him for the award of the University's Ph.D. degree was motivated by ill will or made in bad faith.

4. Mr. Subbiondo has failed to prove by a preponderance of the evidence that any individual member of the University's faculty is vested with authority (actual, implied or apparent) to waive the requirements and procedures set forth in the University's publications, with which Mr. Subbiondo did not comply.

5. Absent positive proof of bad faith, this court will not interfere with the academic decisions of educational institutions of higher learning. In the event an academic determination is found to have been made in bad faith, the appropriate remedy is to order the university to hold an impartial hearing on the academic question and not to usurp the academic function by ordering the university to award its degree.

6. The decision of Temple University not to award Mr. Subbiondo its Ph.D. degree was solely an academic determination on a matter of scholarship, competence and achievement.

7. The determination that Mr. Subbiondo was not entitled to the University's award of its Ph.D. degree was made in good faith, honestly and with due consideration and was supported by valid and significant reasons, including: (a) Mr. Subbiondo's failure to submit a dissertation meeting the academic standards of the Graduate English Faculty; (b) Mr. Subbiondo's failure to register; (c) Mr. Subbiondo's failure to give written notice of his intention to graduate or to pay the required fees; (d) Mr. Subbiondo's failure to form a dissertation committee of members of the Graduate English Faculty; (e) Mr. Subbiondo's failure to submit and and get approval of a dissertation proposal; (f) Mr. Subbiondo's failure to receive unanimous (or even majority) approval by his dissertation committee for his dissertation as a whole.

8. Mr. Subbiondo breached his contractual obligations to the University by not following or meeting the written requirements and procedures prerequisite to the recommendation of the award of the Ph.D. by the Graduate English Faculty and the Graduate School.

9. Because Mr. Subbiondo has never satisfied all the requirements for the award of the University's Ph.D. degree, the University's decision not to award Mr. Subbiondo its Ph.D. degree cannot constitute a breach of any contractual obligations that the University owed to Mr. Subbiondo to award him a Ph.D. degree.

10. This court will not attempt to substitute its judgment for the University's with respect to plaintiff's scholastic aptitude.

11. The University is not liable to Mr. Subbiondo, and judgment must and will be entered in favor of defendant.

## DISCUSSION

In September 1966, plaintiff, Joseph Subbiondo, enrolled in the Doctor of Philosophy program offered by the Graduate Faculty of the English Department of Temple University of the Commonwealth System of Higher Education. He has never qualified for the award of the degree.

Mr. Subbiondo has not qualified for the award of the University's Ph.D. because he has neither satisified the University's academic standards nor complied with the University's applicable requirements. Of the four persons authorized by the University and the Graduate English Faculty to evaluate his doctoral dissertation, three were of the opinion that it failed to meet the academic standards for approval. The only one of the four who ever

suggested that it was acceptable also happened to be the only person other than Mr. Subbiondo who participated in the drafting of the dissertation.

Now, Mr. Subbiando seeks to have this court overrule the University' academic determination and order the University to award him its highest degree. He claims that he has satisfied all of the requirements for that degree. The facts are otherwise.

While a student at the University, Mr. Subbiondo received and became familiar with various official publications which embodied the rules and policies that Ph.D. candidates in English were expected to follow in order to qualify themselves for the award of the degree. Those publications included the 1967 Handbook for Doctor of Philosophy Students, the first sentence of which specifically provided that "[r]esponsibility for meeting all requirements in the programs of study lead to the Ph.D. degree at Temple University rests solely with the student." The 1969-1970 Bulletin of the Graduate School of Temple University contained a similar notice (at p. 86).

Beginning in 1968, rules and policies of general application at the University, as well as the specific requirments of the Graduate English Faculty for the award of a Ph.D. in English, were collected in the "Rule Hoard," a publication of the Graduate English Faculty with which Mr. Subbiondo was familiar. The Rule Hoard included requirements, among others, that

(1) the student register for at least three credit hours of work each semester until the final award of the degree (unless official leave of absence is granted);

(2) the student enlist a member of the Graduate English Faculty to act as his dissertation advisor

and, with his prospective advisor, enlist two additional members of the Graduate English Faculty to form a dissertation committee;

(3) the student develop and complete a formal dissertation proposal for submission to and approval by his advisor, his dissertation committee and the Graduate English Faculty;

(4) the student's prospective advisor, dissertation committee and the Graduate English Faculty approve his dissertation proposal in a specified fashion;

(5) the student secure the Graduate English Faculty's recommendation for candidacy for the Ph.D.;

(6) the student submit each section of his dissertation as it is completed to each of his dissertation committee members for their comment and approval;

(7) the student secure the approval of his dissertation as a whole by his committee; and

(8) the student pass the final examination for the Ph.D. degree, commonly referred to as the oral defense of the dissertation.

Despite his responsibility to acquaint himself with the rules and policies applicable to candidates for a Ph.D. in English and his acknowledged familiarity with and possession of these official publications, Mr. Subbiondo chose to ignore them in his pursuit of the degree.

Mr. Subbiondo took the University's preliminary examination for the degree. (Before a student may begin work on his dissertation, he must pass a preliminary examination in his field of study. Mr. Subbiondo first took the preliminary examination in the Spring of 1969, at which time he failed the oral portion dealing with the History of the Language. In December 1969, he retook that part of his

examination and passed.) He moved to California and assumed a teaching position at the University of Santa Clara. Initially, he merely corresponded from California with Dennis Lebofsky, a member of Temple's faculty whom he desired to be his dissertation advisor, about possible topics. In September 1970, he suggested a possible dissertation topic to Dr. Lebofsky, which Dr. Lebofsky encouraged him to pursue. However, Mr. Subbiondo never submitted a completed formal dissertation proposal to Dr. Lebofsky, to a dissertation committee, or to the Graduate Chairman for circulation to and approval by the Graduate English Faculty. He never even formed a dissertation committee.

During the 1971-1972 academic year, Mr. Sabbiondo began submitting chapters of his dissertation to Dr. Lebofsky. He did not have any other members of a dissertation committee to whom those sections could also be submitted for comment and approval, as required by the Rule Hoard. He merely continued to work in isolation without the knowledge of the Graduate English Faculty.

In April 1972, after Mr. Subbiondo had completed a draft of his dissertation, he then attempted to form a dissertation committee. At Mr. Subbiondo's direction, Dr. Lebofsky informally asked several individuals to read Mr. Subbiondo's draft. Mr. Subbiondo claims that two of those individuals, Mr. Kenneth Schaefer and Dr. Howard Meroney, who subsequently did read his draft, constituted the remainder of his dissertation committee. In fact, Mr. Scheafer was ineligible to sit on a dissertation committee at that time because he was not a member of the Graduate English Faculty. He agreed to read the dissertation without knowing why he was being asked to read it. Nor was Dr. Meroney, a senior member of the Graduate English

Faculty, aware that he was being asked to be on a dissertation committee.

During the next academic year, Mr. Subbiondo learned that Mr. Schaefer had enjoyed reading the draft and thought it was "well done." During that 1972 fall semester, however, Dr. Meroney offered extensive criticisms and dictated over two hours of criticisms and suggestions to Mr. Subbiondo relating to its substance.

In late November 1972, Mr. Subbiondo wrote the then Chairman of the Graduate English Faculty, Dr. Gabriele Jackson, about the supposed delay in his obtaining departmental approval of his dissertation. He included a clipping from the page of the 1969 Rule Hoard containing most of the requirements he had flagrantly disregarded. Again ignoring those requirements entirely, he focused on a single sentence which stated that "the dissertation as a whole must be approved by a committee majority." Despite the fact that Mr. Subbiondo had never even apprised the Graduate English Faculty of his proposed project, that Mr. Schaefer was not a member of the graduate faculty, and that only one member of the Graduate English Faculty, Dr. Lebofsky, had approved the dissertation, Mr. Subbiondo claimed that he had satisfied all requirements and that the Graduate English Faculty was obliged to recommend him for the award of the Ph.D.

Dr. Jackson responded and after citing Mr. Subbiondo's many failures to follow the express rules and policies of the Graduate School and Graduate English Faculty with which he was obviously familiar, advised him that he did not have an approved dissertation proposal, supervisor or committee, much less an approved dissertation. She concluded:

"It seems to me that the best thing we can now do is to clear up the whole situation as openly and with as much dispatch as possible, and bring it into line with the regulations. I am ready to do anything I can to overcome the administrative obstacles, and I hope that you, in turn, will do all you can to incorporate Dr. Meroney's suggestions into your dissertation, in accordance with the process formulated in Rule 30 (the one you sent me)."

Mr. Subbiondo agreed to proceed in accordance with Dr. Jackson's suggestions, and he registered for the 1973 Spring semester. A dissertation committee was formed consisting of Dr. Lebofsky, Dr. Meroney and Dr. Ann Matonis, all of whom Mr. Subbiondo had previously indicated were acceptable to him. He submitted a dissertation proposal which was duly approved by that committee and by the Graduate English Faculty. Both Drs. Matonis and Meroney advised him, however, that in their academic judgment, the dissertation was unacceptable as it stood.

During that semester, Mr. Subbiondo began to make some minor revisions and changes to his dissertation, but did not respond to the principal substantive criticisms of Drs. Matonis and Meroney. Finally, in May 1973, his committee gave him explicit directives to be met for the committee to approve his dissertation. Mr. Subbiondo refused and has continued to refuse to further revise his dissertation in any way.

To give Mr. Subbiondo the benefit of every doubt, the University agreed to obtain the opinion of a fourth reader of the dissertation from a graduate department of another university. After a number of authorities acceptable to Mr. Subbiondo and the University had declined to read and evaluate the

dissertation, Dr. Jackson, with the apparent approval of Mr. Subbiondo, enlisted Dr. Samuel Keyser of the University of Massachusetts. Dr. Keyser read the dissertation without any knowledge of its history or then current status. In November 1974, Dr. Keyser rendered his academic judgment that the dissertation was unacceptable. Dr. Keyser commented:

"First, there were difficulties of a conceptual nature which suggest at the very least a misunderstanding of what constitutes scientific inquiry. Second, there were difficulties of a substantive nature."

He concluded:

"the dissertation does not fall with my own view of what might constitute a dissertation in the field of linguistics. . . . As a linguistics dissertation, then, I would say, applying the standards of my own department to it, that it is simply not suitable. As a dissertation in the history of ideas, where the ideas being researched have to do with linguistic thought and its relationship to the prevailing attitudes toward scientific inquiry, it seems to me that the thesis leaves a great deal to be desired. My judgment would have to be that it needs quite major revision in order to be acceptable and that, in its present form, it certainly is not."

The Graduate English Faculty continued to hold the door open for Mr. Subbiondo to revise his dissertation and secure the approval of his dissertation committee. Mr. Subbiondo chose instead to institute this action seeking to have this court order the University to award him its degree of Doctor of Philosophy as well as damages.

It is a well-settled principal of law that a court's review of the academic decisions of a college or universtiy is limited to an inquiry into whether any such decision was arbitrary and capricious; absent proof of bad faith and arbitrary and capricious conduct on the part of the college or university, the judiciary will not interfere in the institution's academic affairs. As stated by the Supreme Court in Board of Curators of the University of Missouri v. Horowitz, 435 U.S. 78, (1978): "Courts are particularly ill-equipped to evaluate academic performance. . . . [and this and other factors] warn against any such judicial intrusion into academic decision making." Horowitz, 435 U.S. 92. As articulated by the court in Gaspar v. Bruton, 513 F. 2d 843 (10th Cir. 1975): "[School officials' academic] decisions are conclusive, provided that their action has been in good faith and not arbitrary. . . . *The Court may grant relief as a practical matter only in those cases where the student presents positive evidence of ill will or bad motive.* (Emphasis supplied).

Further, Gasper states, "[I]n matters involving educational delinquencies of students, the final determination vests in those public officials charged with the performance of that important determination." Gasper v. Bruton at 850; See also Barnard v. Inhabitants of Shelburne, 216 Mass. at 23, 102 N.E. at 1097. Gasper explicitly provides at p. 851 that, "The courts are not equipped to review academic records based upon academic standards within the particular knowledge, experience and expertise of academicians." Repeatedly courts have held that, "Whether the plaintiff should or should not have received a passing grade . . . is a matter wholly within the jurisdiction of the school authorities, who alone are qualified to make such a

determination." Connelly v. University of Vermont, 244 F. Supp. 156 (D.Vt. 1965) at p. 161. "We know of no case which holds that colleges are subject to the supervision or review of the courts in the uniform application of their academic standards." Mahavongasanan v. Hall, 529 F. 2d 448 (5th Cir. 1976) quoting Dixon v. Alabama State Board of Education, 294 F. 2d 150, (5th Cir. 1961), cert. den., 368 U.S. 930, (1961). Miller v. Hamline University, 60 F. 2d 970 (8th Cir. 1979); Williams v. Howard University, 528 F. 2d 658 (D.C. D.C. 1976), cert. denied, 429 U.S. 850. The Supreme Court in Horowitz, supra, went on to say that while "a number of lower courts have implied in dictum that academic dismissals from state institutions can be enjoined if 'shown to be clearly arbitrary or capricious,'" no such showing was made in the Horowitz case and no such showing was made by Mr. Subbiondo: 435 U.S. at 91, citing Mahavongsanan v. Hall, supra and Gaspar v. Bruton, supra.

The second issue in this action is therefore whether the Graduate English Faculty acted in bad faith or in an arbitrary and capricious manner in refusing to recommend that Mr. Subbiondo be awarded the degree of Doctor of Philosophy.

While Mr. Subbiondo personally may disagree with the determination that his dissertation did not meet the Graduate English Faculty's standards, in order for this court to find the University liable to him, it must as a matter of law, be satisfied that the Graduate English Faculty's decision not to recommend that Mr. Subbiondo be awarded the University's highest degree was not supportable on any rational basis. In light of Mr. Subbiondo's failure to comply with the University's requirements prerequisite to the issuance of a Ph.D. degree by the University and in light of his failure to submit a

dissertation meeting the Graduate English Faculty's standards of quality and scholarship, the decision not to recommend Mr. Subbiondo for the award of the degree is not only supportable, it is the only rational decision possible.

Far from being arbitrary and capricious in determing that Mr. Subbiondo was not qualified to be awarded its doctoral degree, the University was acting in accordance with its own published rules, requirements and policies. The University would have acted arbitrarily and capriciously had it done anything else, since it then would have afforded Mr. Subbiondo favored treatment not given to the other students in the graduate program.

It is beyond this court's purview to attempt to evaluate the merits of Mr. Subbiondo's dissertation. However, it is clear from the evidence that those who were authorized by the Graduate English Faculty to evaluate Mr. Subbiondo's dissertation believed it was not an acceptable dissertation.

Thus, Mr. Subbiondo's claim that the University acted arbitrarily and capriciously is completely unfounded. There are reasonable grounds to support the University's academic judgment concerning Mr. Subbiondo's qualifications for its Ph.D. and the substantive merit of his dissertation. That judgment was the University's to make, and it has done so.

This court finds that the University honestly appraised plaintiff's scholastic aptitude and found it inadequate for the recommendation of a Ph.D. Accordingly, this court finds for defendant, Temple University.

## DECREE NISI

And now, August 5, 1981, upon consideration of

the briefs and argument of the parties, and after trial, the court does enter this decree nisi and hereby dismisses the complaint of plaintiff based upon the reasonings set forth in the foregoing findings of fact, conclusions of law and discussion.