Henry HARRIS, Plaintiff-Appellant,

v.

Margaret BLAKE, Ellis Copeland, Michael J. Gimmestad, and the Board of Trustees of the University of Northern Colorado, Defendants-Appellees.

No. 83–1524.

United States Court of Appeals, Tenth Circuit.

Aug. 14, 1986.

Joseph P. Jenkins, Estes Park, Colo., for plaintiff-appellant.

David R. Brougham (Gordon L. Vaughan with him on brief), of Hall & Evans, Denver, Colo., for defendants-appellees.

Before McKAY, SETH, and SEYMOUR, Circuit Judges.

SEYMOUR, Circuit Judge.

Henry Harris brought this action under 42 U.S.C. § 1983 (1982), alleging that his rights to procedural and substantive due process were violated when he was required to withdraw from a program of graduate study. The district court granted summary judgment in favor of all defendants. We affirm.

I.

Summary judgment is inappropriate unless there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See Clark v. Atchison, Topeka & Santa Fe Ry.*, 731 F.2d 698, 700 (10th Cir.1984); *Western Casualty & Surety Co. v. National Union Fire Insurance Co.*, 677 F.2d 789, 791 n. 1 (10th Cir.1982). On appeal, the record is properly viewed in the light most favorable to the nonmoving party. *Clark*, 731 F.2d at 700; *Luckett v. Bethlehem Steel Corp.*, 618 F.2d 1373, 1377 (10th Cir.1980). Viewed according to this standard, the record reflects the following facts.

In the spring of 1979, Harris was a part-time graduate psychology student in the University of Northern Colorado's Center for Special and Advanced Programs (CSAP), a master's degree program designed for off-campus students. Harris enrolled in a counseling course taught by Professor Margaret Blake. In order to attend classes, he had to commute daily from Boulder to Greeley. His car broke down after four classes, and he could not arrange for other transportation. He left several telephone messages with Blake's office, explaining his absences and ultimately notifying her that he would have to withdraw from the course. He did withdraw in early May.

It is unclear what happened during the four classes he did attend. Blake was present for two of those sessions, neither of which seems to have been exceptional in any way. When she was away at a convention, the class was taught by a graduate assistant, who supervised the students' counseling of volunteer clients. Harris failed to obtain a client of his own and to provide a videotape cassette, both of which were required. His counseling of a volunteer client supplied by another student was observed by the graduate assistant and other members of the class. Among other things, Blake asserts that Harris could not maintain a conversation with the client. Harris responds that he followed instructions not to speak excessively. After his car broke down, he failed to notify the client that he was unable to keep a scheduled appointment. He also missed at least one conference with Blake, although it may have been scheduled to take place after he stopped attending class.

Dissatisfied with Harris' performance, Blake expressed her concerns to Professor Gimmestad, chairman of the psychology department. Subsequently, Harris attempted to obtain Blake's permission to withdraw from the class, but she refused to authorize it. When Harris withdrew via proper administrative channels, Blake consulted with the CSAP Advisory Committee because she wanted the opportunity to evaluate his performance. Professor Ellis Copeland chaired this committee in his capacity as CSAP academic coordinator. Although Blake testified that the committee recommended she put her concerns in writing, Copeland does not recall a formal recommendation. Blake also states that she was instructed to institute proceedings to "oust" Harris from CSAP.

On May 16, Blake wrote the letter which ultimately led to this lawsuit. Addressed "To Whom It May Concern," the text reads as follows:

"This letter concerns when Henry Harris was registered for and his withdrawal from my Introductory Practicum in Counseling, PCG 612, during Spring Quarter of 1979. Mr. Harris was allowed to withdraw by the Dean of Students, long after the drop date and after he had exhibited specific behaviors of being incompetent and unethical in his supervised practicum.

"It is my belief that Henry should not be allowed to register for a practicum and

that if he does, the practicum should be aware of his past performance."

Rec., vol. I, at 8. The May 16 letter became a part of Harris' academic file and was disseminated among some of CSAP's instructors and administrative personnel.

After the May 16 letter was written, the Advisory Committee met to consider the case. The committee determined that no action should be taken to remove Harris from CSAP but that future instructors should be informed of his performance in Blake's course. Although Copeland had read the letter, the committee did not review it or decide that it would serve as the means of informing other instructors.

Copeland called Harris in late May or early June. Harris had registered for another counseling course, and Copeland notified him that he would instead have to take the course at a different location with Professor H. Dan Smith. Smith was associated with the University of Fresno in California and had been hired by CSAP as a visiting professor. During that conversation, Copeland mentioned the May 16 letter and told Harris that Blake had several concerns about him.

Harris enrolled in the course indicated by Copeland. Smith had somehow received a copy of the May 16 letter but did not mention this to Harris. The course consisted of two weekend-long sessions, which proved unusual in that Smith repeatedly confronted half of the fourteen-person class about drinking and other disruptive conduct. Harris claims that Smith did not work with him at any point and that Smith's graduate assistant disparaged him without cause. He also claims that he completed all requirements but nonetheless received a "D" as his final grade.

Harris previously had received an "incomplete" in a CSAP course taught by Copeland. He fulfilled the outstanding requirements by the spring or early summer of 1979, and Copeland gave him a "C" as his final grade. He had been doing "B" work in the first half of the course, and the final paper he wrote was never returned to him. He had earned A's and B's in the other CSAP courses he had taken. One or both of the grades Harris received from Smith and Copeland lowered his average below the required minimum and effectively compelled his withdrawal from CSAP.

During the summer or early fall, Harris tried unsuccessfully to obtain a copy of Blake's letter by mail. At the beginning of October, he went with his father to the CSAP office, where Copeland gave him a copy. After speaking with Copeland, they proceeded to Professor Gimmestad's office and insisted upon seeing him. Their conversation was heated, and Harris demanded to know how and why the letter had been placed in his file. At Harris' request, Gimmestad obtained an explanatory letter from Blake. That letter, dated October 9, explained her original use of the terms "incompetent" and "unethical" as follows:

"Incompetence: Inability to verbalize his own and others' perceptions. Lack of attentive behavior, paucity of listening skills. No warmth, genuineness, respect or empathy in his interactions with client or fellow classmates. No confrontive skills. Language inadequacy.

Unethical: Failure to arrange for client contact; lack of follow-through in meeting client. No appearance at feedback session; no contact then or later with professor. Failure to take responsibility for taping; no tape recorder, tapes, or video tape for feedback."

Rec., vol. I, at 9. The letter also detailed the basis for these conclusions, including Harris' failure to provide his own client and his subsequent failure to inform the client he "borrowed" that he would not be able to attend the next scheduled session. *See id.* at 10.

Harris was not satisfied with Blake's explanation. Pursuing channels within the administration, Harris ultimately per-

suaded Arthur Partridge, Dean of the College of Education, to have the May 16 letter removed from his file. Partridge's written directive stated that the letter should not have been placed in Harris' file. After referring to the threat of legal action and requesting all copies of the May 16 letter, the Dean concluded:

"If Dr. Blake had a reasonable factual basis for accusing Mr. Harris of being unethical and incompetent, she should have filed some sort of charge. That, I think, would have been proper procedure. I believe, however, that this sort of memorandum with no supporting data and no specification of charges is most inappropriate."

*Id.* at 90.

Harris also lodged an official grievance with the school's Academic Appeal Board. He challenged the grades he had received from both professors who had seen the May 16 letter as well as the conduct of Blake and Copeland concerning the letter. After a hearing in which Harris participated, the Appeal Board upheld the grades and declined to rule on the other charges since the letter had been expunged.

One year after the May 16 letter was written, Harris filed this lawsuit and a related action in state court. His federal complaint essentially alleged that he was deprived of a property interest in continued enrollment and a liberty interest in his ability to pursue a career in psychology. He claimed that the conduct of Blake, Copeland, and Gimmestad denied him both procedural and substantive due process and that the Board of Trustees was liable for these violations. In granting defendants' motion for summary judgment, the district court characterized Blake's evaluation as academic rather than disciplinary and ruled that no hearing was required under *Board*

*of Curators v. Horowitz,* 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978). The court also held that any claim of defamation was foreclosed by *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). Finally, the court found no indication of arbitrariness, capriciousness, or bad faith to support the alleged violation of substantive due process.[1] *See Horowitz,* 435 U.S. at 91–92, 98 S.Ct. 955–956.

## II.

■ The Due Process Clause applies when government has deprived an individual of an interest in liberty or property. *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *see also Horowitz,* 435 U.S. at 82, 98 S.Ct. at 951. In *Gaspar v. Bruton,* 513 F.2d 843, 850 (10th Cir.1975), we held that an individual's place in a post-secondary nursing program constitutes a protected property interest. We relied in part upon *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), which recognized a property interest in public education. In *Goss,* the State of Ohio had entitled its residents to a primary and secondary education. *See id.* 419 U.S. at 573, 95 S.Ct. at 735. Colorado has created the basis for a similar claim of entitlement to an education in its state college system, which includes the University of Northern Colorado. The legislature has directed that these colleges "shall be open ... to all persons resident in this state" upon payment of a reasonable tuition fee. Colo.Rev.Stat. § 23–50–109 (1973). The actual payment of tuition secures an individual's claim of entitlement. *See Gaspar,* 513 F.2d at 850. Accordingly, Harris had a property interest in his CSAP enrollment which entitled him to procedural due process.[2]

---

1. Alternatively, the court ruled that neither the individual defendants nor the Board of Trustees could be required to stand trial under the doctrine of qualified immunity and the Eleventh Amendment respectively. In view of our disposition of this appeal, we need not consider these rulings.

2. Harris also asserts that he was deprived of liberty interests in his good name and reputation and in his ability to pursue a career in psychology. If his forced withdrawal had been accompanied by public dissemination of the reasons and if those reasons could have stigmatized his reputation or foreclosed his future career plans, Harris would have been entitled to a name-clearing hearing. *See Miller v. City of*

"The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Cafeteria Workers Union, Local 473 v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961). The Supreme Court has emphasized that less stringent procedural requirements attach when a school makes an academic judgment about a student than when it takes disciplinary action. *See Horowitz,* 435 U.S. at 85–91, 98 S.Ct. at 952–55. In *Horowitz,* a medical student challenged her school's failure to provide a hearing before her dismissal. The student had been informed of deficiencies in her academic performance and, in addition, had received numerous reviews of her work and opportunities to improve. *See id.* 435 U.S. at 80–82, 98 S.Ct. at 950–51. The Court held that the process she received, notice followed by a careful and deliberate determination, satisfied the requirements of due process. *See id.* 435 U.S. at 85, 98 S.Ct. at 952.

■ Harris contends that placing the May 16 letter in his file was disciplinary rather than academic in nature, arguing that it was done to punish him because he missed classes and later withdrew. Like the district court, however, we believe that the decisions affecting Harris were academic rather than disciplinary. The evidence is undisputed that attendance at each class session was critical because the course was a practical one in counseling methods, involving actual participation and observation. The students were so informed and were told they could not be absent. Attendance was thus an academic requirement. Blake's explanatory letter of October 9 clarifies that her concerns were academic, not disciplinary. *See Mauriello v. University of Medicine and Dentistry of New Jersey,* 781 F.2d 46, 50 (3d Cir.1986) (evaluation focused on quality of research and dedication to academic pursuits, not misconduct). Although the May 16 letter may have been prompted by Harris' withdrawal, there is no dispute on this record that Blake's purpose was to ensure that he would be evaluated for his actual performance in class notwithstanding his withdrawal. Harris was thus entitled only to the minimal procedures discussed in *Horowitz.*

■ Arguably, both the May 16 letter and the poor grades Harris received were not careful evaluations in the sense intended by *Horowitz.* Although the letter pertained to academic matters, it may nonetheless have been ill-considered. Dean Partridge flatly termed it "most inappropriate" for an academic evaluation. Harris charges that the grades which forced his withdrawal were not the product of careful deliberation or even inadvertence but rather were foregone conclusions based upon the improperly written letter. Under *Horowitz,* however, the procedures Harris received were more than adequate to protect his property interest in continued enrollment. CSAP provided an established appeals procedure which culminated in a hearing before the school's Academic Appeal Board. Harris employed that procedure and participated personally in the hearing to challenge his grades. Independent review confirmed the propriety of the grades and further demonstrated that the ultimate decision concerning his case was a careful one.

Harris urges that he was entitled to challenge the initial placement of the May 16

*Mission,* 705 F.2d 368, 373 (10th Cir.1983). The record contains no evidence that the May 16 letter was disseminated to anyone not connected with CSAP. We have held in an employment context that "such intra-government dissemination, by itself, falls short of the Supreme Court's notion of publication." *Asbill v. Housing Authority of Choctaw Nations,* 726 F.2d 1499, 1503 (10th Cir.1984). Nor is there evidence that Harris suffered the requisite injury to his reputation or that he was denied enrollment elsewhere as a result. Indeed, by the time of his second deposition, Harris had received an M.A. in clinical psychology from Antioch College and was working on a master's degree in sociology and psychology at the University of Colorado. Given our ultimate conclusion that Harris received procedural and substantive due process, we need not consider whether a graduate student is deprived of liberty when forced to withdraw for reasons which are not made public. *See Horowitz,* 435 U.S. at 83–84, 98 S.Ct. at 951–52 (issue not reached).

letter in his academic file. Due process, however, required that CSAP protect only against the deprivation of Harris' constitutionally protected interest in continued enrollment. That interest was not necessarily jeopardized by an unfavorable letter of evaluation. *Cf. Horowitz,* 435 U.S. at 85, 98 S.Ct. at 952 (notice required when cumulative academic deficiencies created risk of dismissal).

Even if CSAP were constitutionally required to take action with respect to Blake's evaluation, the procedures followed were sufficient. Harris was notified of the letter's existence and nature. Although Harris was unable to obtain a copy by mail, Copeland gave him one when asked in person to do so. Gimmestad obtained an explanatory letter for him from Blake. Harris then appealed until the letters were removed from his file. In short, he received several opportunities to present his position to responsible school officials. It is also uncontroverted that Harris was entitled to place his own explanatory letter in the file and that the Appeal Board was prepared to consider any charges concerning the May 16 letter had it not already been expunged. The requirements of procedural due process were therefore satisfied with respect to Blake's evaluation as well as the challenged grades.

### III.

The Due Process Clause not only provides a procedural safeguard against deprivations of life, liberty, and property but also protects substantive aspects of those interests from unconstitutional restrictions by government. *Hewitt v. City of Truth or Consequences,* 758 F.2d 1375, 1378 (10th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985); *see also Kelley v. Johnson,* 425 U.S. 238, 244, 96 S.Ct. 1440, 1444, 47 L.Ed.2d 708 (1976). We have already held that Harris had a property interest in his post-graduate education. He contends further that defendants' actions which resulted in his dismissal from the program were so arbitrary that they denied him substantive due process.

In *Regents of the University of Michigan v. Ewing,* —— U.S. ——, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985), a student was dismissed from a medical program when he did not pass a required examination. He alleged that his dismissal was arbitrary and capricious because he was denied permission to retake the test although other failing students were routinely allowed to do so. The Court assumed without deciding that a graduate student's interest in continued enrollment constitutes a property interest warranting substantive protection. *See id.* 106 S.Ct. at 512. In assessing Ewing's claim, the Court pointed out that the procedures used by the university had been fair, and that the university had not concealed nonacademic or constitutionally impermissible reasons for dismissal. *See id.* at 513. The Court then stated:

"Ewing's claim, therefore, must be that the University misjudged his fitness to remain a student in the Inteflex program. The record unmistakably demonstrates, however, that the faculty's decision was made conscientiously and with careful deliberation, based on an evaluation of the entirety of Ewing's academic career. When judges are asked to review the substance of a genuinely academic decision, such as this one, they should show great respect for the faculty's professional judgment. Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment."

*Id.* at 513 (footnote omitted).

■ The Court's approach in *Ewing* is dispositive of Harris' claim. He does not assert that the CSAP procedures he used to appeal his grades were unfair. Moreover, there is no evidence in this record that any of the CSAP personnel who were involved harbored nonacademic or unconstitutional motives for effecting his withdrawal. As in *Ewing,* the essence of Harris' claim is that defendants misjudged his fitness to remain a student. We must there-

fore review the record to determine whether the evidence, viewed most favorably to Harris, unmistakably demonstrates that defendants' decision was "made conscientiously and with careful deliberation," or whether the record shows "such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Id.*

The record reveals that a fact issue exists over whether Blake's actions in writing the May 16 letter and placing it in Harris' file were appropriate academic procedures. A fact issue also exists concerning whether the letter affected the grades given to Harris by Smith and Copeland. However, Harris was given the opportunity to challenge the letter and the grades before the Academic Appeal Board. It is the Board's decision that ultimately resulted in Harris' forced withdrawal, and Harris has failed to show that this decision was not made with conscientious deliberation through the exercise of professional judgment. It is undisputed that unbiased faculty members have considered Harris' case and have exercised their own judgment concerning the propriety of the grades that compelled his withdrawal. Accordingly, Harris has failed to support the alleged denial of substantive due process.

The judgment of the district court is affirmed.